May Term, 1854.

SPENCER
v.
THE STATE.

----·-••·-----

### SPENCER v. THE STATE.

The law does not favor the repeal of statutes by implication, but requires clearly repugnant language to effect the repeal.

The act creating the Court of Common Pleas, and defining its jurisdiction, was approved *May* 14, 1852, and empowered said Court to take cognizance of certain civil causes and misdemeanors, and, also, of felonies in two specified cases: 1. When a person so charged with the commission of a felony, was in custody; and 2. When a person so charged, but not in custody at the time, voluntarily submitted to the jurisdiction of said Court. An act was approved *June* 1, 1852, (at the same session of the legislature), entitled "an act providing for the organization of Circuit Courts," &c., "and defining their powers and duties," which contained a clause enacting that said Circuit Courts, in their respective counties, should have "original, exclusive jurisdiction in all felonies." Both acts were incorporated in the same volume of the R. S. 1852. *Held,* that the latter act divested the Court of Common Pleas of its jurisdiction, in any case, over felonies.

The title of the act of *June* 1, 1852, providing for the organization of Circuit Courts, &c., indicates its entire subject-matter.

The parliamentary rule, that an act shall not be repealed at the session at which it is passed, does not apply to a repeal by implication.

The constitution of 1851 does not prohibit the repeal of statutes by implication.

APPEAL from the *Vigo* Court of Common Pleas.

PERKINS, J.—At the *June* term, 1853, of the *Vigo* Court of Common Pleas, *Spencer,* the appellant, was convicted of bigamy, and sentenced to the state prison. He appealed to this Court; and he asks that said judgment and sentence be reversed, on the ground that the Court had no jurisdiction of the cause in which they were pronounced.

The statute creating the Court of Common Pleas, and

*Tuesday, May 23.*

5   41
135  378

5   41
142  468

5   41
169   2
f169  483

5   41
171  377

May Term,
1854.

SPENCER
v.
THE STATE.

conferring its jurisdiction, was approved on the fourteenth day of *May*, 1852, and it empowered said Court to take cognizance of certain civil cases, of certain misdemeanors, and of felonies in two specified cases: 1. When a person charged with that grade of crime was in custody; and, 2. When a person so charged, not in custody at the time, voluntarily submitted to the jurisdiction of the Court.

On the first day of *June*, 1852, eighteen days after the passage of the Common Pleas act, a statute was approved, entitled "an act providing for the organization of Circuit Courts, the election of judges thereof, and defining their powers and duties." Said statute contained this clause, viz.: Such Circuit Courts, in their respective counties, "shall have original, exclusive jurisdiction in all felonies."

Both of the above statutes were enacted at the same session of the legislature, and are incorporated in the same volume of the Revised Statutes, the latter at page 5, the former at page 16.

The question presented is—Does the act conferring exclusive jurisdiction of felonies upon the Circuit Courts, by implication, take away the limited jurisdiction previously possessed, in such cases, by the Courts of Common Pleas?

It will, perhaps, aid us in coming to a conclusion in the premises, if we first endeavor to obtain an accurate view of the precise thing we have to do—the exact point which must be ruled in answering the above question.

This may, to some extent, be accomplished, by defining what we have not to do.

We are, then, not called upon to interpret any ambiguous sections in the act organizing the Courts of Common Pleas, in order to ascertain their scope and meaning. That duty has been performed, in reference to said act, in *Lindville* v. *The State*, 3 Ind. R. 586. The rules, therefore, governing such interpretation need not contribute to extend the length of this opinion.

Nor are we called upon to interpret any doubtful phraseology in the act organizing Circuit Courts. The language of that act is so clear and explicit that it is its own best interpreter.

Nor does it become our duty to reconcile the general provisions of the two acts, or, in any event, to declare the repeal of the one or the other. There is no conflict in their provisions generally, and both acts, and both Courts, may undoubtedly stand.

But one of these acts, the first enacted, contains a provision, in substance, that the Court of Common Pleas shall have, in certain cases, concurrent jurisdiction of felonies; and the other of said acts, that last enacted, declares that the Circuit Court shall have original, exclusive jurisdiction of all felonies. These two provisions, touching this single point, are all that are alleged to conflict. In relation to these, and these alone, have we anything to determine.

It first devolves upon this Court, then, to inquire whether these two provisions do, in point of fact, conflict; whether they are irreconcilably repugnant; for the law does not favor repeals by implication, and requires clearly repugnant language to effect them.

Can, then, the Court of Common Pleas of a county possess a limited jurisdiction over some felonies, and the Circuit Court of the same county possess original, exclusive jurisdiction of all felonies?

It would seem that there could be but one opinion upon language so explicit as that contained in the Circuit Court act. Exclusive means, without the participation of any other; and exclusive jurisdiction of all felonies means, a jurisdiction of them in which no other Court has any participation. Hence the Common Pleas can not participate in such jurisdiction, and still leave it in the exclusive possession of the Circuit Court. The language of the Circuit Court act neither contains, nor implies, any exception, any limitation to any particular mode or course of proceeding; but the jurisdiction is to be original and exclusive in all felonies, and, hence, necessarily requires them to be prosecuted according to the mode of proceeding in said Circuit Court. There is, then, a direct conflict upon this one point, between the two statutes, one provision alone in the one being utterly repugnant to one provision alone in the

other; and, consequently, one or the other of said provisions must give way—must be modified to a certain extent. Either the Common Pleas act must be held to modify the Circuit Court act, so far as to deprive that Court of exclusive jurisdiction of all felonies, or the Circuit Court act must be held to modify the Common Pleas act, so far as to deprive that Court of its concurrent jurisdiction of certain felonies; for, as we have said, concurrent jurisdiction in the one can not stand with exclusive jurisdiction in the other. No construction in *pari materia*, or otherwise, can make it do so.

And we may here remark, that we do not regard the acts in relation to Courts of Common Pleas and those in relation to Circuit Courts as strictly in *pari materia;* but we do so regard the several acts relative to each of said Courts, and that each of said classes of acts should be construed together.

The two provisions, then, being repugnant, the next question is, which provision shall be modified by the other? When two statutes directly conflict in any of their provisions, which of them, by implication, repeals or modifies the other? Does the one last enacted modify the one first enacted, or does the one first enacted modify the later statute? And now arises the necessity of consulting the authorities, and ascertaining the rule of decision applicable to this question.

We find that where such statutes are passed at different sessions of the legislature, there is no difficulty. The rule is settled by a cloud of authorities that the act last enacted controls the former. *Bowen* v. *Lease*, 5 Hill (N. Y.) R. 221, and cases cited.—*Norris* v. *Crocker*, 13 How. (U. S.) R. 429, and cases cited. *Dwarris* on Statutes says (page 573), "Every affirmative statute is a repeal, by implication, of a precedent affirmative statute, so far as it is contrary thereto." It was so ruled in *Foster's* case (6 Coke R., by *Thomas* and *Frazer*, p. 107) the leading case on this point, where it is said, "by the statute of 33 H. 8, cap. 23, it is enacted, that if any person being examined before the king's council, or three of them, shall confess any treason,

misprision, or murder, or be by them vehemently suspected, he shall be tried in any Court where the king pleases, by his commission, &c.; and afterwards another law was made, 1 and 2 P. and M., cap. 10, in these words, 'that all trials hereafter to be had for any treason, shall be had according to the course of the common law, and not otherwise:' this latter act (although the latter words had not been) hath abrogated the former, because they were contrary in matter."

This rule has been applied by this Court repeatedly, and once, at least, at its last term. *Smith* v. *The State*, 4 Ind. R. 500. It was applied upon this state of facts. A law of one session of the legislature gave Circuit Courts jurisdiction of misdemeanors. A law of a subsequent session (see Laws 1849, p. 78) enacted that "justices of the peace in the counties of *Madison*, *Delaware*," &c., "shall have and possess exclusive, original jurisdiction, in their respective counties, in all cases" of simple assault and battery; but this latter act contained no repealing clause; and this Court held that the latter statute, by implication, repealed the former, even as to then pending indictments, though it could scarcely be possible that the legislature, in fact, intended the statute to go so far. But thus was the rule of law in regard to the operation of such statutes, and the Court did not assume to say that a supposed intention on the part of the law-makers, contrary to what they had latest enacted, could be set up to abrogate an established rule of decision. The Court say: "The motion to quash should have been sustained. The act of 1849 giving exclusive, original jurisdiction of assault and battery to justices of the peace in *Delaware* county, took effect from its passage. At the time the motion to quash was made, and at the trial, the Circuit Court had not jurisdiction of the offence." See, also, *Sprigs* v. *The State*, 2 Ind. R. 75.— *Nelson* v. *The State*, *id.* 249.— *Smith* v. *The State*, *id.* 251.— *The State* v. *Lackey*, *id.* 285.— *Talbott* v. *The State*, *id.* 635.— *The State* v. *Trimble*, *id.* 655.— *The State* v. *Loyd*, *id.* 659.

And here we must be indulged in the remark, that we regard the rules for the construction of statutes equally a

part of the law of the land with, and a not much less important part than, the statutes themselves. This power of construction in Courts is a mighty one, and, unrestrained by settled rules, would tend to throw a painful uncertainty over the effect that might be given to the most plainly-worded statutes, and render Courts, in reality, the legislative power of the state. Instances are not wanting to confirm this. Judge-made law has overrode the legislative department. It was the boast of Chief Justice *Pemberton*, one of the judges of the despot *Charles* the second, and not the worst one even of those times, that he had entirely outdone the parliament in making law. We think that system of jurisprudence best and safest, which controls most by fixed rules, and leaves least to the discretion of the judge—a doctrine constituting one of the points of superiority in the common law over that system which has been administered in *France*, where authorities had no force, and the law of each case was what the judge of the case saw fit to make it. We admit that the exercise of an unlimited discretion may, in a particular instance, be attended with a salutary result; still, history informs us that it has often been the case that the arbitrary discretion of a judge was the law of a tyrant, and warns us that it may be so again.

Returning from this short digression to the cases we were noticing, which had been decided by this Court, it will be observed that though they arose upon statutes passed at different sessions of the legislature, still they have a direct and forcible bearing upon that now under consideration, to this extent, at least, that they are conclusive, so far as authority can be, as to the fact of an irreconcilable repugnancy between a statute simply conferring jurisdiction of a class of offences upon one tribunal, and a statute conferring, by plain language, exclusive jurisdiction of the same class of offences upon another tribunal; else the Court, in those cases, would not have held that the latter repealed the former, even, as we have seen, as to then pending cases.

In the light of the decisions above referred to, then, we

are prepared, beyond all doubt, to say that if the legisla- May Term, ture of 1851 had enacted that Circuit Courts should have 1854. exclusive jurisdiction of felonies, and the legislature of SPENCER 1852 had simply enacted that Courts of Common Pleas THE STATE. v. should have jurisdiction in certain cases of felony, the latter act would, in the particular named, have modified the former; and that the Court would not have assumed to set up a conjectured intention, not deduced from the latter enactment itself, on the part of the legislature, that said · latter act should not have such effect. And, on the other hand, we are also prepared to say, that if the legislature, in 1851, had conferred jurisdiction on the Common Pleas in certain cases of felony, and that of 1852 had enacted · that Circuit Courts should have original, exclusive jurisdiction of all felonies, then the latter act, by implication, would have repealed *pro tanto* the former, and deprived the Common Pleas of jurisdiction in cases of felony. Should a Court, in the supposed cases, have decided otherwise than as we have stated, that Court would have exactly inverted the settled rule of decision, and held that a former law modified a later one.

We must now proceed to the inquiry, whether the fact that the two statutes in question were passed at the same session of the legislature, makes any difference?

This precise point arose in *The King* v. *The Justices of Middlesex*, 2 Barn. and Adolph. 818. The question in that case was, "if two contradictory acts are passed in the same session of parliament, to come into operation on the same day, which is to take effect?" After the Court had advised, Lord C. J. *Tenterden* delivered the opinion of the Court. He said, "It appears that in this case the metropolitan act received the royal assent a few days after the local act, and, consequently, we are of opinion that so far as the two acts are contradictory to each other, the metropolitan act, which last received the royal assent, must have the effect of repealing the other." And again: "Our decision is conformable with the doctrine laid down in the *Attorney General* v. *The Chelsea Water Works Company*. There it was resolved that where the proviso of an act of

parliament is directly repugnant to the purview of it, the proviso shall stand, and be held a repeal of the purview, *as it speaks the last intention of the makers.*" The same principle has been applied by this Court. *Ham* v. *The State*, 7 Blackf. 314. It is also laid down in *Dwarris* on Statutes, page 675.

The repugnant acts involved in the case before us, then, are to be considered as though enacted at different sessions of the legislature; and hence can not, as we can perceive, be taken out of the decisions in *Smith* v. *The State*, *Sprigs* v. *The State*, *Nelson* v. *The State*, &c., *supra*.

It will be observed that, thus far, we have devoted almost no space to the question of intention on the part of the legislature, while it is a prominent general doctrine, that statutes must be interpreted according to the intention of the makers. And the question arises, how is that intention to be ascertained?

Formerly it was the custom of the judges to go to the legislature, and inquire what they meant, where the language of an act was ambiguous or contradictory. *Campbell*, in the 1st vol. of his Lives of the Lord Chancellors, p. 241, says, "the qualifications of the chancellor now became of great importance to the due administration of justice, not only from the increase of his separate jurisdiction, but from the practice of the common-law judges, when any question of difficulty arose before them in their several Courts, to take the advice of parliament upon it before giving judgment. In a case which occurred in the King's Bench, in the 39th of *Edward* 3, *Thorpe*, the chief justice, says, 'Go to the Parliament, and as they will have us do, we will, and otherwise not.' The following year *Thorpe* himself, accompanied by Sir *Hugh Green*, a brother judge, went to the house of lords, where there were assembled twenty-four bishops, earls, and barons, and asked them, as they had lately passed a statute of jeofails, what they intended thereby. Such questions, which were frequent in this reign, must have been answered by the chancellor." Lord *Campbell* adds, that "if the lords were still liable to be so interrogated, they would not unfrequently be puzzled;

and the revival of the practice might be a check to hasty legislation."

But the practice has not been revived, and we now go, not to the legislature, but to the language of the statutes they enact for the public, and governed by certain established and binding rules of construction, we, from that, declare the legislative intention.

The first of those rules is, that where the legislature have enacted a statute capable of being executed, couched in plain, explicit language, Courts shall declare that the legislature meant what they said.

Such an act we find the Circuit Court act in question to be, which expressly declares that the Courts created by it shall have original, exclusive jurisdiction of all felonies. We are bound, then, to hold that on the first of *June*, the day said act was passed, the legislature intended the Circuit Courts should have such jurisdiction, no matter what their intention had been eighteen days before. Hence, applying the rule to the present case, where we find they had previously passed a statute which had given a portion of that jurisdiction to the Courts of Common Pleas; and the question is asked, what is now to be done? what did the legislature mean? The answer must be, the legislature shall be intended to have meant that what they last said shall govern, and that it shall, so far as repugnant to what they had formerly said, repeal that former declaration. Such, indeed, is another settled rule of construction.

There is no necessity, therefore, for us to inquire, whether the legislature, or the members of it, really, personally did mean, that a later statute, totally repugnant to a former, should repeal such former statute or not. This is not a case for such inquiry, and we are not at liberty to make it. And the legislature itself is not privileged to make an answer upon the point—an *ex post facto* interpretation to suit the times. That body is estopped by its language; and the law, the settled rules of construction, which this Court is bound to apply, make it imperative that we declare the later statute did repeal the former. It is only where the language of the statute is ambiguous—doubtful, or totally

May Term,
1854.

SPENCER
v.
THE STATE.

unreasonable—that Courts may proceed to hunt for intention, and then only to aid in giving a meaning to the language.

There is another point upon which we have said nothing thus far, viz., in relation to the inconvenience, or failure of justice which it is supposed may result from a decision in accordance with the view we take; for, in the language of the Supreme Court of *Ohio,* in the *Heirs of Ludlow* v. *Johnson,* 3 Ohio R. 553, "it is our duty to declare, not to make the law. To do this correctly, the ordinary rules of construction must be adopted, and the meaning of words, sentences and phrases must not be distorted, in order to sustain a favorite opinion." And in that of the Supreme Court of *Massachusetts* in *Pitman* v. *Flint,* 10 Pick. 504: "A mere failure of justice would not be a sufficient ground for construing the statutes against their clear meaning, so as to give a Court jurisdiction. The proper mode of proceeding would be to apply to the legislature for a remedy. It is only where the construction is doubtful, that the argument from a failure of justice applies."

Nor have we alluded to the parliamentary rule, that an act shall not be repealed at the session at which it is passed.

This has no reference to repeals by implication. *Smith,* in his Commentaries on Statutes, page 908, remarks: "In *England,* it is said, an act can not be repealed in the same session in which it is passed, unless there be a clause inserted expressly reserving the power to do so. This rule, we apprehend, is not adopted in this country. If a subsequent statute contrary to a former act have negative words, it will repeal the former statute. Every affirmative statute is a repeal, by implication, of a precedent affirmative statute, so far as it is contrary thereto; for 'leges posteriores contrarias abrogant.'" This is, also, as we have seen from *Dwarris,* the common-law rule. See, also, 1 Blackstone's Commentaries, p. 60.

We will add that we are strengthened in the position we have taken upon the construction of the acts involved, by the nineteenth section of the criminal-practice act, an act still subsequent to both the aforementioned, but passed at

the same session, and embodied in the same volume of the code, and to be construed with them. It reads thus:

"Informations are filed by the prosecuting attorney, upon affidavit, in any Court having jurisdiction of the offence. Criminal actions prosecuted by information, include all offences not within the jurisdiction of the grand jury, or the exclusive jurisdiction of justices of the peace."

Now, felonies are within the jurisdiction of the grand jury, and, hence, are not to be prosecuted by information; but prosecutions in the Common Pleas are by information, and, hence, must be limited to offences below felony. This statute, it will be observed, does not relate to particular cases of offence, but to the classes of offences as recognized by our statutes, and is a clear legislative expression that no felony shall be prosecuted in the Common Pleas, but that all of that class of offences shall be prosecuted by indictment, and in the Circuit Court. We regard it as conclusive upon the question, and as furnishing a complete answer, if any were needed, to the suggestion, so far as such suggestion could bear on this case, that perhaps the jurisdiction of the Circuit Court was intended to be limited to prosecutions according to the course of the common law; for it shows that felonies are to be prosecuted in no other way. This act is in *pari materia* with both the other acts involved in this case, as it relates to the practice in both the Courts organized by said acts. See, also, the act for the election of prosecuting attorneys. 2 R. S. 1852, p. 385.

If it be said that the constitution prohibits the effect given to the Circuit Court act, we reply that that act contains no provision other than upon the subject-matter of it as indicated by its title, and hence is in conformity to that instrument, and any effect it may have by implication upon prior statutes, is not within any constitutional prohibition. It would be doing injustice to the convention to decide, upon slight conjecture, that they intended to change a long-established rule of law. We think, therefore, that the Court of Common Pleas had no jurisdiction of the

case, and that the judgment against the appellant should be reversed.

STUART, J.—*Spencer* was prosecuted for bigamy. Before indictment found in the Circuit Court, he voluntarily submitted to the jurisdiction of the Common Pleas. On being arraigned, he entered the plea of guilty, and was sentenced to the penitentiary for two years.

To test the jurisdiction of that Court, he prosecutes this appeal.

In *Lindville* v. *The State*, 3 Ind. R. 580, the jurisdiction of the Common Pleas over felony was the question directly presented; and so far as the act to establish that Court was involved, such jurisdiction was unanimously sustained.

The question now presented is one of conflicting jurisdiction between the Common Pleas and the Circuit Court.

Since the decision in 3 Ind., the Revised Statutes have been published. The fifth section of the act to organize Circuit Courts confers on that tribunal "original, exclusive jurisdiction in all felonies." 2 R. S. 6. It is contended that this act, approved *June* 1, 1852, and taking effect *May* 6, 1853, repeals the seventeenth and eighteenth sections of the Common Pleas act, approved *May* 14, 1852, and taking effect *October* 1, 1852, as being the later expressed will of the legislature.

In favor of this view, 7 Blackf. 314, 8 *id*. 581, 2 Ind. 440, and numerous other authorities, are adduced. But the rule in these cases is applicable only to enactments "clearly repugnant." In all such instances of "manifest repugnance," the maxim *leges posteriores priores contrarias abrogant*, must prevail.

The sections supposed to be thus repugnant, and so repealed by the foregoing clause in the Circuit Court act, are these:.

"SEC. 17. Said Court shall have original jurisdiction of felonies which may not be punishable with death, under the following restrictions, viz.: any person charged with a felony, who is in custody at the time; and any one charged

with a felony, who, before indictment found by a grand jury in any other Court, voluntarily, either by personal appearance or in writing, submits to the jurisdiction of the Court, which submission it shall not be competent for him afterwards to withdraw or cancel; shall be put upon trial in said Common Pleas, without the intervention of a grand jury, in the same manner as is herein provided for the trial of misdemeanors, and with the same powers as to judgment and execution as belong to the Circuit Court in cases of felony. Said Court shall also have full power to try any criminal charge on change of venue from the Circuit Court, with the like powers and incidents as belong to such Circuit Court; and when the party is in custody, or voluntarily submits to the jurisdiction as aforesaid, said Court shall appoint an early day for trial, either in term time or in vacation.

"SEC. 18. In cases contemplated by the preceding section, the intervention of a grand jury shall not be necessary, but complaint shall be filed as in other criminal cases in said Court; and in all other respects such Court shall be governed by the rules of proceeding and evidence which by law or usage prevail at the time in the Circuit Court.

"SEC. 19. In criminal cases the charge or complaint provided for in the preceding sections to be filed without the intervention of a grand jury, shall be sufficient on demurrer or motion to quash, if it be certain in its allegations to a common intent."

There are several considerations recognized by Courts in the exposition of statutes, which seem to exempt the sections in question from the operation of the rule.

A seeming or partial repugnance is not sufficient. Courts are invariably reluctant to declare a statute repugnant, unless it is clearly so. Accordingly, every hypothesis favorable to the harmonious co-existence of the two acts is to be first carefully weighed.

In this connection, the intention of the legislature in distributing jurisdiction between the two Courts, is a primary object of inquiry.

It has been seen, 3 Ind. R., *supra*, that the new Court was

intended to provide against the ruinous delays of the old system; to administer justice more promptly and, therefore, more efficiently, at less expense to the public, and without the intervention of a grand jury; to secure witnesses more easily and while the facts were yet fresh in the memory; and in the spirit of the new constitution, to administer justice "speedily and without delay."

So far, it is believed, the exercise of this jurisdiction by the Common Pleas, has operated beneficially. Before a feature so satisfactory to the public is blotted out of the new Court, with all the confusion and consequences that must ensue, the intention of the law-maker to repeal should be clearly ascertained.

These two acts are now component parts of the revised statutes. In a legislative revision, the work of many hands, discrepancies were to be expected. No doubt there are many. At almost every step ambiguity and seeming conflict will meet the Courts. And yet the task of ascertaining the leading design of the legislature is not believed to be insuperable. By a cautious adherence to the settled rules of statutory construction, the Courts may, in most instances, reconcile seeming discrepancies, and carry out those beneficial reforms which the legislature contemplated.

This mode of interpretation is as far removed from "bending rules to meet cases," as it is from that narrow, literal adherence to mere words, insensible of principles, which would render almost any enactment a mass of ridiculous contradictions. " Scire leges, non hoc est verba earum tenere sed vim ac potestatem." In statutory exposition, the reason, the spirit, the intention of the law, is above the mere cavil about words. The chief thing to be explored is the intention. This the judiciary is to seek in the history of legislation; in the objects contemplated, the evils to be corrected, and the remedies provided.

It ill becomes the judiciary to affect to ridicule statutory exposition. So long as we have a judicial system, says a distinguished judge, we can not escape the power of judicial construction. "Wherever human language is used, except in mathematics," says Lieber, "interpretation is indis-

pensable. Its necessity lies in the nature of things, in our minds and in our language. No code can provide for all specific cases, or be construed so as to close all further inquiry." It is quite visionary, says *Kent*, to expect, in any code of statute law, such precision of thought, and perspicuity of language, as to preclude all uncertainty.

This statutory interpretation, it is needless to add, is a work necessarily devolved upon the judiciary.

The case at bar is important in itself; but still more so as evolving the principles which are to govern the Courts of the state in the construction of the revision.

It will be observed that in the Circuit Court act, there is no direct repealing clause. The repeal, if any, is by implication; and the policy of the law is not favorable to this species of repeal. Smith 879.—Dwarris 674.—1 Kent 467, note b.—*Bowen* v. *Lease*, 5 Hill 221.—*Wood* v. *The United States*, 16 Pet. 342.—1 Ohio St. R. (1852) 20 and 367.

This rule is applicable to penal, as well as to other statutes. Thus the act of 1 and 2 *Philip* and *Mary*, that all trials for treason should be according to the course of the common law, and not otherwise, was held not to repeal 35 H. 8, for trial of treason beyond sea. Dwarris, *supra*. So in *Capen* v. *Glover*, where one town was set off from another by act of the legislature, containing a stipulation that certain lands should not be taxed, it was held that a subsequent general tax law, though in terms it embraced these very lands, did not operate as a repeal of the former provision. 4 Mass. R. 305. So also in *Dodge* v. *Gridley*, by an act regulating estrays, passed in 1831, persons living outside of village corporations were entitled to have their stock at large exempt from liability of being taken up by the village authorities. The charter of the town of *Harmer*, passed in 1837, authorized the town council to prevent any description of animals from running at large in the streets. It was insisted that as to the limits of *Harmer*, the latter act repealed the former. But the Court says, "repeals by implication are not favored. When two affirmative statutes exist, the one is not to be construed to

repeal the other by implication, unless they can be reconciled by no mode of interpretation." 10 Ohio 177.

So also *Mc Cartee* v. *The Orphan Asylum Society.* The statute of wills in *New-York* prohibited a devise to a corporation. The act incorporating the *Orphan Asylum Society* declared that they might purchase real estate. It was held that the one did not repeal the other; for though the word purchase, in its legal acceptation, included a devise, yet that it was more congenial to the spirit of both acts to understand the word *purchase* as intended by the legislature to *be used in a restricted sense.* 9 Cowen 437.

So also in *Goldson* v. *Buck.* In 1740, an act was passed, empowering the lord of the manor of *Farlington*, his heirs and assigns, at their costs, to convey water from his estate to *Portsmouth*, and through the streets, and, for that purpose, to break up the pavements, &c. In 1792, more than fifty years after, the *Portsea* act was passed, vesting the property and exclusive control of the pavements in commissioners, without any saving of the former act. It was urged that as no progress had been made in the work during the whole period between the passage of the two acts, it was reasonable to presume that parliament, deeming the adventure abandoned, had by vesting such powers in the commissioners, impliedly repealed the former act. But *Ellenborough*, C. J., held that the powers under the several acts might well subsist together. They were severally conferred for different purposes. 15 East 372. Here the control of the pavements was exclusively in the commissioners, except as to the rights conferred by the prior act.

So also our own Court in *The State* v. *Rackley.* The act of *January* 20, 1824, left it discretionary with the jury to find a verdict of guilty, in criminal cases, without costs. The act of *January* 30, 1824, expressly provided that upon every conviction the officers should be entitled to certain specified fees. The one act, it was held, did not repeal the other. The practical construction given to these acts, sustaining both, was, that upon every trial the costs should follow the conviction; the officers should have their fees except when the jury expressly found otherwise. Here it

will be observed, as in *Goldson* v. *Buck*, and as in the case at bar, the prior act was the exception, the latter act the rule. Thus were both acts upheld. 2 Blackf. 249.

In each of these cases, and the first and last upon penal statutes too, the seeming repugnance is quite as strong as in the case at bar. In the first example, the affirmative words are as comprehensive as those in the Circuit Court act—all treasons shall be tried according to the course of the common law, to which the strong negative language, "and not otherwise," is superadded. Yet in all these and numerous other parallel cases, scattered through the books, repeal by implication is denied and both statutes upheld. Bac. Ab., Statute, J.—Dwarris 674.—Smith Comm., *supra.*

Judicial reasoning on this subject is, perhaps, more uniform than in almost any other. To ascertain the intent by settled rules of interpretation, is the great problem. Thus, *Smith* on Statutory Construction. Where it is not manifestly the intention of the lawgiver, from the whole system of legislation on the subject, that the latter act should control the former, it shall not be construed to have that effect, even though the words, taken strictly and grammatically, would repeal the former act. Smith Comm., s. 757. So, accordingly, Lord *Kenyon*, one of the most conservative of judges, as quoted by *Dwarris* 659 and 693.— *Capen* v. *Glover*, 4 Mass. 305.— *Vinton* v. *Welsh*, 9 Pick. 87.—Dwarris 690.—*Holbrook* v. *Holbrook*, 1 Pick. 254.

Again, all the parts of a statute, and different statutes in *pari materia*, whether repealed or not, in short, the whole system of legislation on the subject-matter, are to be considered with reference to the intent. Dwarris 705. Smith Comm. 751, 752. Accordingly, also, *Parsons*, C. J., in *Pease* v. *Whitney*, 5 Mass. 380. For it is to be presumed that a code of statutes relating to one subject, was governed by one spirit and policy; and was intended to be consistent and harmonious. 1 Kent 463. Thus, also, the Supreme Court of the *United States*. If from a view of the whole law and other laws in *pari materia*, the evident intent is different from the literal import of the terms employed to express it in a particular part, the intention

should prevail, for that is, in fact, the legislative will. 2 Cranch 386. In such cases, some degree of implication will be called in to aid the intent. 6 Cranch 307. Nor shall a particular thing given in a prior statute in *pari materia*, be taken away by any subsequent general words. Dwarris 658. But in such case the particular intent is to be considered in the nature of an exception. *Id.* 658, 765. Or as *Marshall*, C. J., states it, the general expressions were used in a particular sense. *Adams* v. *Wood*, 2 Cranch 336.

This mode of reasoning in regard to conflicting statutes, has the greater significance, when, as in the case at bar, the two acts were passed at the same session of the legislature. *State* v. *Rackley, supra.* For it is not to be presumed that the assembly would capriciously undo to-day, what had been solemnly done yesterday, on matters of such vital moment to the public.

Nor is it easy to conceive how, consistently with the reasoning and principles of the authorities cited, the jurisdiction of the Common Pleas over felony, being the particular thing, definitely and minutely pointed out, can be controlled by the general words in the Circuit Court act.

There are other rules of construction recognized in the books, which, at first view, might seem to militate against the jurisdiction claimed. Thus it is said that statutes which give a new remedy, or create a new jurisdiction, ought to receive a strict construction. But the same authority questions its correctness, and limits its application to commissioners, and other inferior officers, exercising summary powers. Dwarris 750.

Another salutary rule, sometimes perverted, is, that penal statutes shall receive a strict construction. Dwarris 736. Yet according to the same author, this applies only to the *fact* and the *punishment. Ibid.* In the *United States* v. *Morris, Taney,* C. J., while admitting the rule, held, that the evident intention of the legislature ought not to be defeated by an over-strict construction. 14 Pet. 464. The rule, says *Parker,* C. J., does not exclude the application of common sense, in order to avoid an absurdity which the

legislature ought not to be presumed to have intended. *The Commonwealth* v. *Loring*, 8 Pick. 370.—9 Bac. Ab. 252-3.—1 Kent 462.—15 Johns. R. 380. Accordingly, *Spencer*, C. J., in 13 Johns. R. 497.

But in a question not so much affecting persons as it is a seeming conflict between two Courts, to what end should the construction be strict? It is a penal statute, either way. The felony over which both have jurisdiction, is punished to the same extent in both Courts. But, on other grounds, the preponderance seems in favor of the Common Pleas. The very object of that Court as explained in *Lindville* v. *The State*, *supra*, is dispatch and efficiency. The public is every way deeply interested in having prisoners promptly disposed of. So that of the two, the new Court, giving the accused a speedier adjustment of his constitutional rights, and the public a more efficient administration of justice, is entitled to the greater consideration.

Here, then, are two affirmative acts passed at the same session. As to felony, they are in *pari materia*. The words of both are explicit. It is not surely the first duty of the Courts curtly to announce that the one repeals the other, before the settled rules of construction have been carefully applied, to the end that both may, if possible, stand and have effect.

The practical operation of such a rule would be, it is feared, to repeal by implication a large part of the revision.

It is, therefore, deemed wiser and safer to adhere to the rule laid down by Judge *Holman* in the earlier days of this Court, (since quoted with approbation by the best elementary writers), that less violence is done to the intention of the legislature by giving a construction which shall support both acts, than there would be to suppose that by one act it was intended to repeal another enacted at the same session. 2 Blackf. 249.

Having thus deduced the rule from the adjudicated cases, it seems proper to inquire whether any light is to be obtained from other parts of the revision.

It is not proposed to comment on 2 R. S., art. 4., p. 363,

as that is understood to be judicially before the Court in another form. Nor is it believed that, when properly considered, there is anything in it inconsistent with the jurisdiction claimed for the Common Pleas.

It is believed the revision itself furnishes the very rule of construction contended for. 2 R. S. 339. "The construction of all statutes of this state shall be by the following rules, unless such construction be plainly repugnant to the intent of the legislature, or the context of the same statute." "Words and phrases shall be taken in their plain ordinary sense; technical words in their technical import."

Now taking this all together, it is substantially the rule of construction at common law, only, as we shall see, made still more liberal. 1 Kent 462. In cases of ambiguity or conflict, the Courts are as much bound as ever to resort to the well-settled rules of statutory exposition, to ascertain the intent of the legislature. It is still left, after all, as a matter of intent, whatever words are used. To so expound a statute as, on the one hand, to carry into effect the beneficial reforms contemplated by the lawgiver, and, on the other, not to assume legislative powers by *making* rather than expounding law, remain now as they have ever been, among the highest and most delicate duties of the judiciary.

The rule of construction, as to whether it shall be strict or liberal, is worthy of special notice. "The foregoing rules of construction and definition of terms shall be in addition to and part of those adopted in the code of civil practice; and, together with those, shall apply to all statutes or acts of the legislature." 2 R. S. 341.

So it would seem that in the construction of statutes, penal acts shall not be distinguished from others. The same rule shall apply to all, civil and criminal.

What, then, are the rules adopted in the civil practice, as above alluded to? Among them are the following: "The provisions of this act shall be liberally construed, and shall not be limited by any rules of strict construction." 2 R. S. 223.

The sum of these various and scattered provisions, is
this: a liberal construction is extended to all statutes, and
the plain intent of the legislature respected and carried
out. This rule gives efficiency to remedial legislation.
On any other principle, a technical judiciary, clinging nar-
rowly to the letter, in disregard of the spirit of the statute,
might retard, and even wholly defeat, the most useful and
needed reforms.

It but remains to apply to the case at bar the canons of
construction thus deduced.

Regarding the two acts in *pari materia* as to felony,
they stand and may be interpreted thus: The Circuit
Court shall have original, exclusive jurisdiction of all
felony, except as is otherwise provided in the seventeenth
and eighteenth sections of the act to establish Common
Pleas. Thus may both be upheld.

The jurisdiction of the Common Pleas over felony is
different from that of the Circuit Court. The one is purely
statutory, dispensing with the grand jury and other com-
mon-law appendages. The jurisdiction of the other is ac-
cording to the course of the common law. These powers
severally conferred for different purposes, and to be exer-
cised in a different manner, may well subsist together and
thus both acts be upheld.

The history of the legislature that passed these acts,
furnishes two remarkably strong facts against the inten-
tion to repeal. One of these is the strict observance of
the parliamentary law, that an act passed is not to be re-
pealed at the same session. Dwarris 673. This rule was
obviously known and respected. For when the assembly
of 1851–2, the same which passed the acts in question,
wished to dispose of the act in relation to county boards
and other enactments passed at an early day, and which
were found to be duplicated, or inconsistent with the sub-
sequent revision, it did not leave these conflicting acts in
the statute-book, to be repealed by implication, to the
embarrassment of the people and the Courts. Nor yet did
the assembly violate the parliamentary law by repealing at
the close what had been enacted at the beginning of the

session. But an act was passed suspending the obnoxious statutes. Laws 1851–2, p. 31.

The second fact in the history of the legislature of 1851–2, relates to the repealing act. It must be conceded that notwithstanding the parliamentary rule, the assembly had the power to repeal acts passed at the same session. The very claim that there was an implied repeal admits the right to repeal directly. Now on the 18th of *June*, 1852, and long after the approval of both the Common Pleas and Circuit Court acts, another act was passed entitled "an act to repeal all former acts of the legislature except those therein named." The first section reads: "All laws not enacted at the present session of the general assembly are repealed." Had it been the intention to repeal the seventeenth and eighteenth sections of the Common Pleas act, that intent could have been easily and briefly expressed. That no such repeal is expressed, leaves, says *Dwarris*, a strong presumption that it was not intended. Dwarris 717. Had the seventeenth and eighteenth sections been obnoxious, we should have found them either suspended in the suspending act, or repealed in the repealing act. Instead of that, we find all the laws enacted during the session, carefully excluded from the operation of the repealing act.

If the intention of the law is thus plain, and yet words are used which either in their usual sense or technical import are fatal to that intention, what are the Courts to do? The common-law rule of construction, as deduced from the authorities, and the legislative rule as prescribed in 2 R. S., chap. 17, *supra*, make the judicial path plain. In such cases of repugnance between the intent and the language, the Court has only to follow the statutory rule, viz., ordinary words shall not be taken in their usual sense, nor technical words in their technical import; but the Courts shall give the words and phrases used, such limited acceptation as shall make the law accord with the manifest intention of the legislature.

If this be judicial legislation, it is such as the common law and the statutes of this state authorize.

The opposite ground combines far more of the elements which define judicial law-making, without the merit of being either remedial or politic. For this Court to divest the Common Pleas of jurisdiction over felony—a jurisdiction so clearly, and upon such weighty considerations of public policy, conferred, is not easily distinguished from the assumption of power to repeal statutes, and repudiate the rules of construction which the co-ordinate branch had provided.

For these reasons, it is thought that both acts are in force. Passed at the same session, relating to the same subject-matter, and forming parts of the same general system, they require no judicial indulgence to enable them to stand together harmoniously in the revision.

I am therefore of opinion that the judgment of the Common Pleas should be affirmed.

*Per Curiam.*—The judgment is reversed.

*S. B. Gookins,* for the appellant.

*R. A. Riley, N. B. Taylor,* and *J. Coburn,* for the state.