SHOEMAKER, AUDITOR OF STATE, ET AL. *v.* SMITH ET AL.

SINKING FUND.—*Constitution.—Construction.*—The word "invest;" as used in section 4 of article 8 of the constitution, in order to harmonize with section 6 of the same article, must be construed as broad enough to cover loans made by the counties, and that the fund may be intrusted to them for that purpose; and yet, while covering the loan of money, it does not restrict to that mode of investment.

SAME.—*Statute.—Constitutionality.*—The amendatory act of February 24th, 1871, in regard to the sinking fund, is not in conflict with section 4 of article 8 of the constitution.

SAME.—*Recital.—Certainty.*—The act of 1871 is sufficiently certain in its reci-

tal of the act amended; and the date of the approval of that act is not neces-
sary to be stated in the act amending it; and the court will take judicial no-
tice that there is no other act with the title which is recited.

SAME.—*Title.*—The title of the amendatory act adds nothing to the title of the
original act, and the title of the original act is valid, because it has a single
subject sufficiently indicated or expressed; and it embraces the amendments
as though they had been, at first, a part of the original act.

SAME.—*Mistake.—Intention.*—The use of the terms, "board of commissioners
of the sinking fund," and "board of sinking fund commissioners," in the act,
does not vitiate the statute, as it is plain what party was intended.

SAME.—*Sixth Section.—Fourth Section.*—The original sixth section of the act
amended, and the entire amendment of 1871, are valid, with the exception
of the fourth section of the amendment, on which *no conclusion was reached,*
*as it was not involved in the decision.*

APPEAL from the Marion Circuit Court.

WORDEN, C. J.—This was an action by the appellees
against the appellants to restrain the latter from distributing
to the several counties of the State the school funds in the
hands of the auditor, amounting, as is alleged, to four hun-
dred thousand dollars or more, in accordance with the pro-
visions of an act of the legislature, approved February 24th,
1871 (Acts 1871, p. 6), amendatory of an act on the subject
of those funds, approved March 11th, 1867. Acts 1867,
p. 21.

Judgment for the plaintiffs below.

There was no question made in the court below, nor is
there in this court, except those arising upon the contro-
verted validity of the act of 1871, above cited. A number
of objections to the act in question have been urged, which
will be considered in such order as is convenient and seems
to be appropriate. The questions thus arising are not en-
tirely free from difficulty, and we have given them the atten-
tion and consideration which their importance and magni-
tude demand. We desire to say here that we have been
greatly aided, in the consideration of the questions presented,
by the able and exhaustive arguments, both oral and written,
of the learned counsel for the respective parties.

In order to an understanding of the questions presented,
it will be proper to set out the title of the act of 1867, and

the sixth section of that act, and also the act of 1871, with its title. They are, respectively, as follows:

"An act to provide for the custody and management of the notes, bonds and mortgages arising directly out of loans heretofore made by the board of sinking fund commissioners; to continue in force all laws or parts of laws in force on the 20th day of January, 1867, which are applicable to said loans and the securities therefor; to clothe the auditor of state with the powers, and subject him to the duties in relation to said loans and securities therefor, which by said laws are vested in, or imposed upon said board of sinking fund commissioners; to provide for the incidental expenses of the management of said loans and securities, including clerk hire, and for the mode and periods of the payment of such allowance for expenses; substituting the seal of the auditor of state for that of the board of sinking fund commissioners, and declaring an emergency for the immediate taking effect of this act, and providing for auditor of state to execute bond and payment of all moneys into the state treasury. Approved March 11th, 1867.

"Section. 6. All moneys received by the auditor under this act, or under any of the acts hereby continued in force, or belonging to said sinking fund, shall, whenever the sum amounts to four thousand dollars or more, forthwith notify the secretary and treasurer of state of the amount of said fund in his hands, and the said auditor, secretary and treasurer, shall immediately proceed to invest the funds then in the hands of said auditor, or under his control, in the five or two and one-half per cent. stocks of the State, by purchasing the same on the best and lowest terms that they can be had for in the market; and the said auditor shall keep an accurate list of the names of the persons from whom purchased, the time and place of purchase, and the price paid therefor; and he shall report to the governor at least once in three months, and to the general assembly at each session, a full account of all his transactions in relation to such purchases; any stocks or bonds thus purchased shall be imme-

diately cancelled by writing across the face 'purchased for the school fund,' dated and signed by the auditor, secretary and treasurer of state; and a non-negotiable bond shall be issued in favor of said school fund, as now provided by law."

"An act to amend the sixth section of an act to provide for the custody and management of the notes, bonds, and mortgages arising directly out of loans heretofore made by the board of sinking fund commissioners, to continue in force all laws, or parts of laws, in force on the 20th day of January, 1867, which are applicable to said loans and the securities therefor; to clothe the auditor of state with powers, and subject him to the duties in relation to said loans and securities therefor, which by said laws are vested in or imposed upon said board of sinking fund commissioners; to provide for the incidental expenses of the management of said loans and securities, including clerk hire, and for the modes and payment of such allowance for expenses, substituting the seal of the auditor of state for that of the board of sinking fund commissioners, and declaring an emergency for the immediate taking effect of this act, and providing for the auditor of state to execute bond and payment of all moneys into the state treasury, and adding supplementary sections thereto. Approved February 24th, 1871.

"Section 1. Be it enacted by the general assembly of the State of Indiana, that section six of the foregoing entitled act be amended so as to read as follows:

"All moneys received by the auditor under this act, or under any of the acts hereby continued in force, or belonging to said sinking fund, shall, whenever the same amounts to four thousand dollars or more, forthwith notify the secretary and treasurer of state, of the amount of said fund in his hands; and the said auditor, secretary, and treasurer shall immediately proceed to distribute among the different counties of the State, in proportion to the number of inhabitants in such county according to the late census; and in making such distribution among the several counties, the said board of sinking fund commissioners shall notify the

county auditor of such county or counties as may be entitled to such distributive shares or parts, from time to time, of the amounts so ready for distribution; and thereupon the said county auditor shall draw his warrant in favor of his respective county treasurer, on the board of commissioners of the sinking fund, for such sum or sums as he may have been notified is ready for distribution for such county; such treasurer shall present the same to the board of commissioners of the sinking fund, who shall pay the same to such county treasurer.

"Sec. 2. As fast as the said sinking fund shall come into the different counties of this State, as provided by this act, the same shall be loaned out. The county auditor and county treasurer of their respective counties shall proceed to loan out and invest, in said funds so held in trust for common school education, by loaning the same upon real estate security, in the same manner and subject to the same conditions as the other common school funds are now loaned by law: *Provided*, that the amount of interest arising from the loans made under this act shall be disbursed by the county auditor and treasurer without diminution.

"Sec. 3. All loans hereafter made by said auditor and treasurer shall be at the rate of eight (8) per cent. per annum.

"Sec. 4. Any officer who shall receive any bonus or interest for deposit of any part of this fund, shall, upon conviction thereof, be deemed guilty of a felony, and shall forfeit his office.

"Sec. 5. It is hereby declared that an emergency exists for the taking effect of this act; therefore, the same shall take effect and be in force from and after its passage."

It is claimed by the appellees that the distribution of the fund to the several counties of the State, as contemplated by the act of 1871, is in violation of the fourth section of the eighth article of the constitution of the State; and hence that the law providing for such distribution is void. The fourth section must be taken in connection with the sixth

section of the same article, as they both bear upon the subject. They are as follows:

"Sec. 4. The general assembly shall invest, in some safe and profitable manner, all such portions of the common school fund as have not heretofore been intrusted to the several counties; and shall make provision by law for the distribution, among the several counties, of the interest thereof.

"Sec. 6. The several counties shall be held liable for the preservation of so much of the said fund as may be intrusted to them, and for the payment of the annual interest thereon."

The argument of the appellees, on this point, may be stated briefly, thus: As the constitution requires the general assembly to "invest" the fund in some safe and profitable manner, it cannot be distributed to the counties and put out at interest, as is contemplated by the law in question; that the term "invest," as used in the constitution, requires a disposition of the fund different from a mere loan of it upon interest; such as the purchase of bonds, stocks, etc.

We have come to the conclusion that the word "invest" was not used in the restricted sense thus claimed, but in a sense broad enough to embrace the idea of a loan at interest. It will be borne in mind that at the time of the adoption of the constitution, a large amount of the common school fund had been intrusted to the several counties, and had been loaned out, and was drawing annual interest, which went to the support of common schools. With this state of facts in the minds of the framers of the constitution, the two sections of that instrument, above quoted, were adopted. In arriving at the proper construction of that instrument, we must consider all its parts; and it may be observed that the latter part of section four, which makes it the duty, of the general assembly to make provision, by law, for the distribution among the several counties of the interest on the fund, implies that it shall be so invested as to produce interest.

The object of the section was to make the fund secure, and also make it return or yield interest to be distributed to

the several counties. This object might be accomplished, either by lending the money at interest on safe and ample security, or by the purchase of interest-bearing bonds or securities, that were safe, and in all respects secure. If the fourth section, standing alone, would be doubtful, still, the sixth section being construed with it, the meaning of both is reasonably clear.

By the sixth section, the right of the legislature to intrust the fund to the several counties, to be put at interest, is expressly recognized. The several counties are to be held liable for the preservation of so much of the fund as may be intrusted to them, and for the payment of the annual interest thereon. The language employed cannot have reference to the fund that had already been intrusted to the counties, because it speaks for the future and not for the past. It contemplates a future intrusting of the fund, or some part of it, to the several counties. The words "may be" are peculiarly appropriate to express the future and not the past. *Indianapolis, etc., Railroad Co.* v. *Kercheval*, 16 Ind. 84. That the language employed had reference to the future and not to the past, is also shown by the debates in the convention. In the debates of the convention (vol. 2 p. 1880), it is shown that when the article in regard to education was under consideration in the convention, a motion was made to recommit, with instructions to strike out the following: "The several counties of this State shall be held liable for the preservation of so much of said funds as may be entrusted to them, and the payment of the annual interest thereon." This, it will be seen, was section six, above quoted, before some very slight verbal alterations were made. On the motion to recommit, etc., Mr. Bryant, who was a member of the committee on education, said: "I am opposed, therefore, to any provisions which shall say to those having charge of this fund, this is your own fund, waste, squander, or destroy it, as you may, you shall be held to no accountability therefor. Another reason why I favor this section is, that at the expiration of the charter of the state bank, a very large portion of this

fund, heretofore employed in the bank, will be seeking other investment. It may become necessary to deposit it with the counties. Are you prepared to say that they shall not be responsible for its safe keeping? The section applies to moneys which may hereafter be entrusted to them; it is not necessary so far as the funds heretofore placed in their hands are concerned. The law has already fixed and determined their responsibility for them, and even if you strike out this section, their liability for past losses will not be changed nor affected."

Now, as in section six, the right of the general assembly to intrust the fund to the several counties is clearly recognized, and as the counties are to be held liable for the preservation thereof, and also for the payment of the annual interest thereon, it cannot be conceived that the convention used the term "invest," in section four, in a sense that would make it utterly inconsistent with the right thus recognized in section six. We therefore think that the word "invest," as used in the fourth section, in order to harmonize with the sixth, must be construed as broad enough to cover loans made by the counties, and that the fund may be intrusted to them for that purpose. In other words, the term "invest" is used in a sense broad enough to cover the loaning of the money, but does not restrict to that mode of investment. This is a little beyond the ordinary meaning of the word, but the context absolutely requires the construction we have given it; otherwise the sixth section, above quoted, would remain a dead letter, without force or significance.

Webster defines the word "invest" as follows: "To lay out money in the purchase of some species of property, usually of a permanent nature; literally, to clothe money in something; as, to invest money in funded or bank stock; to invest it in lands or goods." In this application it is always followed by "in." But we know that in common parlance the word is sometimes used in the sense which we ascribe to it in this instance; thus we sometimes hear it said that a man's money

is invested on bond and mortgage, or note and mortgage, meaning that it is lent on those securities.

The British parliament, within a short time after the adoption of the constitution, viz., in 1859, used the word "invest" in the sense of to lend; the sense covered by the word in the case before us. In an act of 22 and 23 Vict., ch. 35, sec. 32, we find the following provision: "When a trustee, executor, or administrator shall not, by some instruments creating his trust, be expressly forbidden to invest any trust fund on real securities, in any part of the United Kingdom, or on the stock of the Bank of England or Ireland, or on the East India stock, it shall be lawful for such trustee, executor, or administrator to invest such trust fund on such securities or stock; and he shall not be liable on that account as for a breach of trust, provided that such investment shall in other respects be reasonable and proper." No argument is necessary to show that the word was not used in this act in the restricted sense which would limit the investment to a purchase, but in the broader sense which would permit loans upon the securities named.

The view we take of this question is strengthened by, because it is in harmony with, the contemporaneous construction of the constitution by other departments of the government. The fund in question arose from sections 113 and 114 of the act of January 28th, 1834, establishing a state bank. This fund is, by the constitution, made a part of the common school fund. Up to 1859 it continued to be loaned out by the board of sinking fund commissioners established by the bank act, in accordance with that act. On January 15th, 1859, an act of the legislature was passed, providing for the election, by that body, of a new board of sinking fund commissioners, and providing that they should have all the powers and discharge all the duties theretofore appertaining to the sinking fund board, and be governed by the laws which then were, or which might thereafter be, enacted in reference thereto. 1 G. & H. 572. Here is a very clear recognition of the right, under the constitution, to invest the fund by way of loan. Soon after

this, viz., on the 1st of March, in the same year, another act was passed providing for a distribution of the fund to the several counties to be loaned out. 1 G. & H. 574.

There are, probably, other instances of similar legislation, but the above are sufficient for our purpose, which is to show the contemporaneous legislative construction of the constitution. From the time of the adoption of the constitution down to January, 1859, the legislature permitted the fund to be loaned as it had theretofore been, and then passed an act virtually providing for future loans; and soon after an act for the distribution of the fund to the several counties to be loaned. While contemporaneous construction by the legislative department is by no means conclusive, it is not without weight, and is entitled to respect.

From the foregoing considerations, we hold that the act of 1871 is not in conflict with the fourth section of the eighth article of the constitution.

We proceed to the other questions involved in the case. And first, it is objected that the amending act of 1871 leaves it uncertain what law was intended to be amended. This objection is made on the ground that the date of the approval of the act amended is not stated, either in the title to, or the body of, the amending act; and upon the ground of the slight verbal discrepancies which exist between the title of the act amended and the recital thereof in the title of the amendatory act. The discrepancies alluded to, it will be seen by comparison, are so slight as to be of no importance whatever. The very slight verbal inaccuracies occurring in the transcription could not mislead any one, and they do not, as we think, render it at all doubtful or uncertain what law was intended to be amended. There was no need of stating the date of the approval of the amended law. This is usually, but not necessarily done, and the omission can be of no consequence if the law intended to be amended is pointed out with such reasonable certainty as to identify it. This is done by a substantial recital of its title, and we will take judicial

notice that there is no other statute bearing such title.    This objection is not well taken.

Again, it is insisted that the title of the amended act is not sufficient to embrace the subject-matter of the amendments.

The title of the amendatory act adds nothing to the title to the original act, so that the question is presented whether the title to the original act is sufficient to embrace the amendments, had they been at first a part of the original act.

The constitution requires that "every act shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title."

The question presented is not free from doubt and difficulty. But an act of the legislature should not be held void as unconstitutional, unless it be clearly so. Where the constitutionality of a statute is merely doubtful, it is the duty of the courts to sustain it. *Stocking* v. *The State*, 7 Ind. 326. *Maize* v. *The State*, 4 Ind. 342.

In looking at the title of the act of 1867, we find a variety of enumerated particulars, all bearing upon one general subject, viz., the management of the sinking fund. The whole subject could have been much more briefly, if not better, expressed, by the title, "An act providing for the management of the sinking fund."

If the different particulars enumerated are to be regarded as so many different subjects, then the law is wholly void because of a multiplicity of subjects. If, on the other hand, the enumerated particulars do not embrace different subjects, but have reference to one general subject, which is not sufficiently expressed in the title, the law is still void. If, however, the enumerated particulars are not expressive of different subjects, but of one general subject, which is sufficiently indicated or expressed, the law is valid. One of three conclusions must follow; either, first, that the act is void, as embracing too many subjects; or, second, that it is void because no subject is expressed in the title; or, third, that it is valid, because it has a single subject sufficiently expressed in the title. The latter is the conclusion which we, with

some doubt and hesitation, draw from the premises. The particulars enumerated we regard as expressive, not of so many different subjects, but of one general subject, the management of the sinking fund. The mode adopted of expressing this subject is circuitous, verbose, and prolix; but taking the entire title together, we think the subject named above is sufficiently expressed. There can be no exact standard of certainty erected, by which to test the sufficiency of the expression of the subject. We quote, as in point, and as expressing views in which we fully concur, the following passage from the opinion of the court in the case of *Bright v. McCullough*, 27 Ind. 223: "The constitution does not assume to divide the general scope of legislation, and classify the parts under particular heads or subjects, but, of necessity, has left that power to be exercised by the legislature, as it, in its wisdom and discretion, shall deem proper. The constitution assumes that different subjects of legislation do exist, and requires that each act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title. The purposes of the provision, in view of the evils intended to be guarded against, can only be effected by requiring that the subject expressed should be reasonably specific, or, in other words, should be such as to indicate some particular branch of legislation, as a head under which the particular provisions of the act might reasonably be looked for."

Some liberality must be allowed in the construction of the language employed to express the title; otherwise many valuable and beneficial acts of legislation, which have stood unquestioned for years, must fall to the ground, and the constitutional provision which was intended to remedy an evil will itself become a *source of unmitigated evil.*

We conclude, that under the title to the act in question, any member of the legislature might reasonably have looked for any legislation on the subject of the management of the sinking fund, and that the title is virtually as broad as if it

had been "an act to provide for the management of the sinking fund."

But we are met with the argument, that inasmuch as the title enumerates certain particulars in reference to the sinking fund, although the management of that fund was the subject, yet the legislation must be limited to the particulars enumerated; and the case of *The State* v. *Bowers*, 14 Ind. 195, is cited upon the point.

We recognize the authority of that case and the correctness of the decision; but we think a distinction may be drawn between that case and the present. In that case the title of the amended act was, "An act concerning licenses to vend foreign merchandise, to exhibit any caravan, menagerie, circus, rope and wire dancing, puppet show, and legerdemain." The amendment, without enlarging the title, sought to require a license for exhibiting a concert for pay. It was held, that though the subject of the act was licenses, yet that subject was limited to the particulars enumerated in the title of the act sought to be amended, and that the amendatory act was void for the want of a sufficient title. There, it will be seen, the subject of the act, licenses, was, in the title, expressly limited to the particulars enumerated. No member of the legislature, or other person, upon reading that title, would conceive that in the body of the act a license might be required for any other purpose or purposes than those enumerated.

How is it in the case before us? The first clause of the title is as follows: "An act to provide for the custody and management of the notes, bonds, and mortgages arising directly out of loans heretofore made by the board of sinking fund commissioners." Would not a person, upon hearing this clause read, infer that the "custody and management" might relate, as well to the moneys when due and paid, as to the notes, bonds, and mortgages by which the moneys were secured? What special management did the notes, bonds, and mortgages, merely as such, require?

There is another clause in the title that may be noticed,

viz., that "to provide for the incidental expenses of the management of said loans and securities," etc. The management of the loans and securities being mentioned in the title, it might well be inferred that the management of the fund was provided for in the body of the act. Indeed, the words "loans and securities" seem to be put to represent the fund. The language of the title, instead of excluding the idea that the management of the fund was provided for in the body of the act, is open to the inference, to say the least of it, that such provision was made.

It follows, from these considerations, that the original sixth section of the act of 1867 was valid, and also the entire amendment of 1871, as the scope and effect of both the original and the amendment were to provide for the management of the fund. We except from this conclusion the fourth section of the amendment, on which we express no opinion, as no question in the cause arises upon it.

Finally, it is claimed that the amendment is so uncertain and incongruous in its terms as to be incapable of execution, and, therefore, void. The amendment of the sixth section illustrates the remark of Chancellor KENT, that "such is the imperfection of human language, and the want of technical skill in the makers of the law, that statutes often give occasion to the most perplexing and distressing doubts and discussions, arising from the ambiguity that attends them." 1 Kent Com. 461.

The first branch of the section, by its literal terms and grammatical construction, requires the moneys, whenever four thousand dollars or more shall have been received by the auditor, to give notice of the fact to the secretary and treasurer of state.

Again, the board of commissioners of the sinking fund is mentioned three several times in the same amended section, although that board ceased to exist on the 20th of January, 1867, by virtue of an act passed December 21st, 1865. 3 Ind. Stat. 502, sec. 7. But, says the author before quoted, the

"real intention, when accurately ascertained will always prevail over the literal sense of terms."

In the terse language of Judge STUART, in the case of *Spencer* v. *The State*, 5 Ind. 41, "in statutory exposition, the reason, the spirit, the intention of the law, is above the mere cavil about words. The chief thing to be explored is the intention. This the judiciary is to seek in the history of legislation, in the objects contemplated, the evils to be corrected, and the remedies provided."

The evident intent of the first clause of the section was to require the auditor, whenever the specified amount of moneys was received by him, to give the notice specified. This, in our minds, admits of no doubt. By a slight change only in the structure of the sentence, this intent may be more clearly expressed; thus, "whenever moneys amounting to four thousand dollars or more are received by the auditor under this act, or under any of the acts hereby continued in force, or belonging to said sinking fund, he shall forthwith notify the secretary and treasurer of state of the amount of said fund in his hands." By this reconstruction of the sentence the intent is more clearly expressed, but is scarcely rendered more apparent.

Then, the inappropriate use of the term "board of sinking fund commissioners" does not render the intent and meaning of the legislature, in any considerable degree, doubtful.

By the act abolishing that board, above referred to, it was required, after the 20th of January, 1867, "to surrender to the auditor of state all the books and papers, stocks, bonds, mortgages, moneys, rights, credits and effects belonging to said fund." By the first section of the act of 1867, the act thus amended, the auditor was invested with the powers, and subjected to the duties, touching the loans and securities, that had pertained to the board of sinking fund commissioners.

Thus it will be seen that the auditor had not only the legal custody of the fund, but also stood, in relation to the fund, in the shoes occupied by the late board.

Now, in each instance in which the term "board of commissioners of the sinking fund," or "board of sinking fund commissioners," is used in the amendment, it is intended to designate the officer, person, or body having the legal custody and control of the fund. This is apparent on the face of the statute, and no argument could make it plainer. The auditor of state was that officer. We can hardly conceive by what obliviousness such a mistake, in the designation of the officer intended, could have been made. But the mistake does not vitiate the statute. Where it is clear, as in this case, what party was intended, a mistake in his description or designation does not defeat the intention.

The maxim, "*Falsa demonstratio non nocet,*" aptly applies. There are many cases scattered through the books that illustrate and sustain the principle above applied, but we will not consume time, nor extend this opinion, by collecting them here. The legal effect of the statute is the same, in our opinion, as if the auditor of state had been designated in the several instances where the mistaken term was used.

We have thus considered the several questions in the cause, and have not been able to see any valid objection to the law; and we are of opinion that the court below erred in holding it void.

The judgment below is reversed, with costs, and the cause remanded, with directions to the court below to dismiss the cause.

*B. W. Hanna,* Attorney General, *D. W. Voorhees, S. Claypool, W. R. Harrison, J. W. Nichols,* and *L. Jordan,* for appellants.

*J. L. Mitchell, W. A. Ketcham, J. E. McDonald, J. M. Butler,* and *E. M. McDonald,* for appellees.