# IN GENERAL TERM, 1872.

STATE OF INDIANA *ex rel* BAYLESS W. HANNA, Attorney
General, *v.* NATHAN KIMBALL *et al.*

Appeal from NEWCOMB, Judge.

TREASURER OF STATE—*liability of—*
BOND OF—*how far liable on—*
SURETIES ON—*Bond of, how far liable.*

The act to provide a treasury system for the State of Indiana,* and the act
of 1861, entitled "an act defining certain felonies, and misdemeanors,
and prescribing punishment therefor, and providing for certain evidence
on the part of the State,"† must be construed in *pari materia.*
The purpose of these acts is to compel the keeping of the money of the
State in the safes, and vaults provided for in the first cited act, and to
prohibit the use of the funds in the hands of the Treasurer by investing,
loaning, or depositing the same.
The last clause of the *fifth* section of the act of 1859,¶ which requires that
all interest, or bonus received by the Treasurer of State, arising out of
any money of the State, shall by him be fully accounted for, is not a
penalty prescribed for the violation of law.
The penalties prescribed by the act of 1861,‡ for all violations of the provi-

*1 G. & H., 645.        †2 G. & H., 456.        ¶1 G. & H., 645.        ‡2 G. &. H., 456.

sions of the act of 1859, show an intention on the part of the Legislature to abandon the remedy provided by the last clause of the *fifth* section of the act of 1859, and said clause of said act is no longer operative, the legislation of 1861 being inconsistent therewith.

Where all the funds, which by law are properly in the hands of the Treasurer of State, have been fully accounted for, and paid over, neither he, nor his sureties are liable on his official bond as Treasurer, for other funds acquired by the doing of acts in violation of law, and which acts constitute a crime, or misdemeanor.

*Bayless W. Hanna,* Attorney General, *Solomon Claypool, Napoleon B. Taylor, W. R. Harrison,* for the State.

*Gordon, Brown, & Lamb, Hanna & Knefler,* for defendant.

BLAIR, J.—This is a suit against the defendant Kimball and his sureties, upon the official bond given by Kimball as Treasurer of State.

At Special Term three breaches of the bond were assigned, but subsequently all were dismissed by the plaintiff but the first, which is, that the defendant did not honestly and faithfully discharge his duties as Treasurer of State, nor did he pay, account for, and deliver to the plaintiff, or his successor in office, or other person authorized to receive the same, all the moneys, securities, and assets belonging to the plaintiff, but that during his term of office he, as such Treasurer of State, received, and had under his control a large amount of money belonging to the plaintiff, which he used on his own account, and in his private business, loaned to divers persons at interest, and deposited in banks of deposit at interest, and by reason of such use, loans, and deposits he made, and received interest, profits, and income thereon to a large amount, and which he has failed to account for, or pay over to his successor, but has converted the same to his own use.

Separate, and joint demurrers were filed by the defendants to this assignment of breach. These demurrers were sustained on the ground that the assignment did not state facts sufficient to constitute a cause of action.

Judgment was then rendered on the demurrer at Special Term, in favor of the defendants, and an appeal was then taken by the plaintiff to General Term.

The question presented by the assignment of error is the action of the Court at Special Term on the demurrer.

The State, in the breach of the bond set out in the complaint, seeks to recover of the defendants, interest, profits, and income alleged to have been received by the defendant Kimball from the use of money of the plaintiff in his private business, and from loans, and deposits of money of the State.

It is not charged that there has been any failure to pay over, or account for the principal of moneys that came to his hands as Treasurer.

An examination of the statutes relating to the duties, and obligations of the Treasurer of State is necessary in the consideration of the question presented by this demurrer. In 1859 an act was passed to provide a treasury system for the State of Indiana. 1 G. & H., p. 645. Without citing the act in full, it will be necessary to notice the following provisions contained therein:

Section one provides that the room occupied by the Treasurer of State, together with the safes, vaults, etc., "shall constitute the treasury of the State of Indiana," and the Treasurer is required to use the same " as the sole place for the deposit, and safe keeping of the moneys of the State, etc."

The third section specifies what moneys shall be paid into the State treasury.

Section four requires the execution of a bond by the Treasurer, and sets out the conditions it shall contain.

Section five prohibits the Treasurer from *loaning*, *using*, or depositing in any bank, or with any person, any of the moneys of the State, and says the same shall be safely kept until directed to be paid out, or transferred by law, and the Treasurer is "expressly prohibited from receiving, in any

manner, for his own use, any interest, premium, gratuity, bonus, or benefit whatever by the disposition of, or arising out of any money, or property belonging to the State, or to any county, or any fund of the State, or county, or of any loan obtained for the State, or for any county, *but whatever is so received shall by him be fully accounted for.*

The sixth section requires every person making payment into the treasury to first furnish the Auditor of State with a description of the liability on account of which payment is to be made, this is to be certified to the Treasurer, and the Auditor must also " make his draft in favor of the Treasurer upon the person making the payment, and the certificate, and draft must then be presented to the Treasurer, and he shall receive the money; and the Treasurer is expressly prohibited from receiving any money into the treasury except it be thus paid upon draft."

Section seven expressly prohibits the Treasurer " from paying any money out of, or transferring any money from the treasury of the State, except upon the warrant of the Auditor of State," etc.

This act prescribed no penalties for the violation of any of its provisions. It prescribes certain things that shall be done, and the manner of doing them, and prohibits in express terms the doing of certain other things, and among them the receiving by the Treasurer of any interest, or bonus, or benefit by the disposition of any money belonging to the State, but says that " whatever is so received shall by him be fully accounted for."

It is evident from the express provisions of this statute, that it was the intention of the Legislature that the money in the treasury of the State should be kept at all times in the safes, and vaults provided for that purpose. The act was passed for the purpose of preventing the money from being removed for any purpose except upon the warrant of the Auditor of State, drawn in pursuance of law. It is evident

4

that the Legislature was looking to, and legislating to secure the safe keeping of the monies of the State, and intended that no license should be given for the removal of the money, and its deposit in bank, for the reason that it might endanger the safe keeping of the fund.   The State does not levy taxes, and cause them to be paid into the treasury for the purpose of being loaned, or deposited for purposes of accumulation, but to be applied to the payment of the current expenses of the government, and to discharge the obligations of the State.   It is not expected that large sums of money will accumulate, and lie in the hands of the Treasurer, or be loaned, or deposited by him, and the statute says expressly that the Treasurer shall not so use the money, nor receive any interest, or bonus for his own use, by the disposition made of, or arising out of any money of the State.

To add this provision: that " whatever is so received shall by him be fully accounted for," is an anomaly in legislation.

It is very unusual for a State to prohibit the doing of an act, and at the same time provide that if the act is done, and a profit made, interest, or bonus received, it must be fully accounted for, and paid over.

This paying over and accounting for is not provided as a penalty for the violation of the law, but so far as the act under consideration specifies, it simply proposes to the Treasurer that if he should remove the money from the vaults, and loan, or deposit it, and receive therefor any interest, the violation of law will be forgiven if he shall fully account for the amount received.

However unusual this kind of legislation may be, it is perhaps competent for the Legislature to so enact, and if this legislation stood alone, though the mode of the accounting, or authority to call upon him to account is not in any manner defined, nor any remedy specified if there is a failure to account; courts might find a remedy, and enforce it, by

State of Indiana *v.* Kimball.

sustaining a suit upon his official bond, or otherwise. But at the next session of the Legislature, in 1861, another act was passed entitled " an act defining certain felonies, and misdemeanors, and prescribing punishment therefor, and providing for certain evidence on the part of the State.  2 G. & H., 456.

The first section of this act says, that if any officer entrusted with money of the State shall use the same by way of investment, or shall loan, or deposit the same, " he shall be deemed guilty of a felony, and upon conviction thereof shall be imprisoned in the State prison, not less than one, nor more than twenty-one years, and be fined not exceeding double the value of the money, etc."

By the third section it is made a misdemeanor for the Treasurer to *receive, or pay out* any public money in any other manner than as prescribed by law, and on conviction thereof he " shall be fined not less than fifty, nor more than five hundred dollars, and be imprisoned in the county prison not less than one year."

Section five provides that if the Treasurer of State shall receive any fee, bonus, or perquisite of any kind, on account of any public money, and shall fail, or neglect to report, and pay the same into the treasury, in the manner, and at the time required by law, he shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum equal to double the value of the amount so received, and be imprisoned in the county jail not less than one month, nor more than one year.

These acts being expressions of the legislative will upon the same subject, must be construed in *pari materia.*  It is evident that the general intention, and purpose of the last act is the same as that of the first, that is, to compel the keeping of the money in the safes, and vaults provided for in the first recited act, and prohibit the use of the funds of the State in the hands of the Treasurer by investing, loaning,

or depositing the same. The act just cited is highly penal in its character.

The Treasurer is in the first place expressly prohibited from removing the monies from the treasury to use, loan, or deposit the same. In the second place, it is equally unlawful for him to receive any interest, or bonus, for the use, loan, or deposit of the monies. To do the first act is a felony ; to receive any interest, or bonus is a misdemeanor.

Suppose we give force, and effect to every portion of these acts, by holding that the interest sued for can be recovered in this suit upon the official bond of the Treasurer by reason of the provision that requires the Treasurer to account for " whatever is so received." The State would in such case recover the amount of interest of the Treasurer in a civil suit, *by virtue of the contract contained and entered into by the Treasurer and his sureties,* in the execution by them of the bond.

In addition to this the Treasurer might be convicted of a felony for using, loaning, or depositing the money, and imprisoned in the State prison for not less than one, nor more than twenty-one years.

Again, he might still further be convicted of a misdemeanor for receiving the interest, and failing to account for it, and on conviction the law says he " shall be fined in a sum equal to double the value of the amount so received, and be imprisoned in the county jail not less than one month, nor more than one year."

The act of 1861 is the last expression of the Legislature, and there is no question as to the validity of its provisions. Does it repeal any of the provisions of the former act, and especially that portion requiring interest illegally received to be accounted for ? Is the last clause of the fifth section of the act of 1859 in force, so as to give the State a right of action in a civil suit against the Treasurer, and his sureties on the bond ?

State of Indiana *v.* Kimball.

Now it is, perhaps, competent for the Legislature, by express statute, to authorize the taking of an obligation, bond, or contract from her officer that he will not do an illegal act that is a felony, and that he will not do another additional act with reference to the same matter that is a misdemeanor, and at the same time contract that if these acts are done, the State shall receive all the profits that may be acquired by the illegal and criminal acts, and give a remedy to recover those profits if they are not voluntarily paid over.

Courts would be slow, however, to imply such an intention on the part of the Legislature, from any doubtful, or vague expressions of a statute; for it is an old, well established, and wholesome rule of law, founded on general principles of public policy, that no court will lend its aid to a man whose cause of action is founded upon an illegal or immoral act.

If A lets B have a thousand dollars under an agreement that B shall not wager the same in any game of chance, and a further agreement that if he does so wager it, and win, the profits resulting therefrom shall be paid to A, a court will not permit A to come in, and invoke its aid to assist him in recovering the profits of B.

It is possible, as before indicated, that the State, by her Legislature, may set a bad example—one at variance with all previous rules of public policy—by reserving to herself a right of action to recover the proceeds of an illegal act, not as a penalty for a violation of her laws, but because she has so stipulated in the contract or bond.

But to so hold, there must be no doubt as to the legislative intention, and the same should be clearly, and definitely expressed. So far from the statutes clearly indicating such intention, there is much that leads us to an opposite conclusion.

The act of 1859 was mild in its character. It prohibited

State of Indiana *v.* Kimball

in express terms the doing of certain things, but gave no sanction to the prohibitions by providing penalties. It then provided that interest acquired by violations of the law should be fully accounted for. This was not by that act intended to be imposed as a penalty for the violation of law, but seems to indicate that if interest is so received the State shall have a right to call upon him, and compel an accounting, settlement, and paying over of the interest illegally acquired. This would involve a waiver on the part of the State of the wrong done in violating the law, and an adoption of the illegal acts of the Treasurer, by which the interest was 'acquired, and an acceptance of the money in satisfaction of the wrong, and of the contract of the Treasurer to account for the same.

While for the purpose of carrying out the intention of the Legislature in protecting the treasury, the above construction might properly have been given to the section cited in the act of 1859 when standing alone; the adoption of the act of 1861 seems to clearly indicate an intention on the part of the Legislature to abandon the remedy which was given, or allowed by the act of 1859; and without proposing to rely on the contract, obligation, or duty to account for the interest illegally acquired, substituted penalties to be inflicted, or incurred, not only when the first step towards acquiring the interest was taken, but additional ones to be applied when the second step should be taken—that of receiving the interest.

We are strengthened in this conclusion by the fact that one of the penalties in the act of 1861 is measured by the amount of interest received, and the fine can not be less than double the amount received.

Is it reasonable to conclude that the Legislature in 1861 intended that the State should have a right of action in a civil suit against the Treasurer, and his sureties on their bond to recover interest which he was prohibited from

acquiring, and in addition that he might be convicted of a felony, and imprisoned in the State prison for loaning, or depositing the money by which the interest was acquired, and also that he might be convicted of a misdemeanor for receiving the interest, and not accounting for it, and imprisoned, and fined, as before stated, in a sum not less than double the amount received?

This would be an accumulation of remedies, the parallel of which can not be found in our statutes, and is not warranted by the spirit of any code not based on the " principles of vindictive justice," and we can not suppose that the Legislature had such intention.

In arriving at these conclusions, we are not letting down the barrier, and opening the door for fraud, and peculation. If the money in the treasury is not fully accounted for, the Treasurer, and his sureties are clearly liable for it. If removed from the vaults to loan, or deposit, the 12th, and 13th Sections of the act of 1859 give a summary, and efficient remedy, in addition to a suit upon the bond if the money is not accounted for.

Again, the provisions of the penal act of 1861 being valid, an enforcement of its provisions would be more efficacious than for the State to say to the Treasurer you must not loan, or deposit the money in your hands, but if you do loan it, I will agree to receive the interest of you, and you, and your sureties must agree in your bond to pay it to me. After making such agreement, it would be bad faith on the part of the State to turn around, and enforce the provisions of the penal act of 1861, and punish the Treasurer for the acts by which the interest was made, which, if the position of the plaintiff is correct, she had before contracted, by taking the bond of the defendants, to receive.

By accepting the office, and entering upon the duties of the same, the Treasurer assumes all the obligations incident to a faithful, and honest discharge of those duties,

and the object to be attained by the execution of the official bond is, that the State may have the undertaking of others as sureties for the Treasurer, and while the sureties in such case are liable upon the bond in all cases where the principal is clearly liable, they are nevertheless sureties, and ought not to have their obligations extended by doubtful construction beyond the terms of the law, and the bond, or contract which they have entered into. It is not necessary to cite authorities in support of this well recognized rule of law. When all the funds, which by the terms of the law are properly in the hands of the Treasurer, have been fully accounted for, and paid over, to hold the parties liable for other funds that have been acquired in violation of law, and in acquiring which the Treasurer may be prosecuted in criminal actions, is extending the terms of the bond beyond anything that the parties could reasonably be held to contemplate at the time of its execution.

For these, and other reasons given by Judges Newcomb and Rand, a majority of the Court is of opinion that the latter clause of the fifty-second Section of the act of 1859 is no longer operative, the legislation of 1861 being inconsistent therewith, and that the action of the Court at Special Term should be affirmed.

We all concur in the ruling of the Court at Special Term, that the Attorney General had authority to institute the suit as stated in the opinion of Judge Rand.

Judgment affirmed.

State of Indiana *v.* Kimball.

*Held :* That the State can not maintain a civil suit against an ex-Treasurer of State for interest charged to have been realized by him from loans of State funds, so long as she makes the requirement that he shall not pay such interest into the treasury in any other way than by accusing himself of the commission of an offense against the criminal code, and placing on record evidence to be used against him in case the State should resort to a prosecution for such offense—*per Newcomb, J.*

*Statutes of* 1859, *and* 1861, *and Sec.* 14, *Article* 1, *Constitution of Indiana,* construed.

NEWCOMB, J.—I concur in opinion with my brother Judges that the Attorney General had authority to institute this suit in the name of the State, and I agree with Judge Blair that the judgment at Special Term should be affirmed.

My conclusion in favor of affirmance is based more particularly on the sixth section of the Treasury Act of 1859, 1 G. & H., 647, and Section 14, of Article 1, of the Constitution of Indiana.

Section 6, of the Treasury Act, is as follows :

" Every person making payments into the treasury of State, shall furnish to the Auditor of State *a description of the liability on account of which such payment is to be made,* and the Auditor of State, after careful examination of such documents, or accounts, as the case may require, shall certify to the Treasurer of State the amount to be paid, and the fund to which it is to be paid, and shall make his draft in favor of the Treasurer upon the person making the payment, which certificate and draft shall then be presented by such person to the Treasurer of State, who shall receive such money; number, register, file, and preserve such draft, and certificate, and shall give a receipt for the amount paid, specifying the liability on account of which it is paid; *and the Treasurer of State is expressly prohibited from receiving any money whatever into the State treasury, or on account of any fund thereof, except it be paid upon drafts as herein provided.*"

By the statute of 1861, cited in the other opinions delivered in this case, it is made a criminal offense in the Treasurer of State to loan, or deposit money belonging to the State treasury; yet if he does so loan, or deposit the same, he can not possibly pay into the treasury any interest received thereon, without furnishing evidence against himself in a criminal prosecution. He must first report to the Auditor the fact that he has violated the law, and state the amount of profit realized thereby; then on his report the Auditor is required to issue a certificate, and draft, both necessarily reciting the fact that the Treasurer has made unlawful gains on the State's money, and both these documents the offending Treasurer is required to *register*, *file*, and *preserve* in his office, as permanent record evidence against himself, or, if he has ceased to be such officer, then his successor is in like manner to register, file, and preserve them.

This is the only mode by which the unlawful interest can find its way to the State treasury, for the statute expressly prohibits its payment in any other manner.

It is for not doing this, that the present suit has been brought against Kimball, and the sureties on his official bond. Can any man, be he a public officer, or private citizen, be held liable for damages in a civil action for not doing an act, the doing of which is an accusation against himself that he has violated a criminal statute? The Constitution gives an emphatic negative answer. It says: "No person, in any criminal prosecution, shall be compelled to testify against himself."

In *Wilkins* v. *Malone*, 14 Ind., 154, the Supreme Court make the following observations on this clause of the Constitution: "Literally, this provision extends to criminal prosecutions only, and not to civil actions; but we think its spirit and intent go much farther, and protect a person from a compulsory disclosure in a civil suit, of facts tending to criminate the party, whenever his answer could be given in

evidence against him in a subsequent criminal prosecution."

In *Ford* v. *The State*, 29 Ind., 542, it was held that a witness not only was not bound to give testimony which would tend to show him guilty of a crime, but that he was not bound to disclose a single link in the chain of evidence which would convict him.

If a witness, called to testify in a court of justice, may not be required to answer a question, the answer to which may by possibility be used against him in a subsequent criminal prosecution, it is equally true, in my judgment, that no man can be required to furnish evidence out of court that might be used against him in a subsequent criminal prosecution.

In opposition to this view of the case in hand, it has been urged that the same reasoning would absolve the Treasurer from returning money illegally taken from the State treasury. The cases do not seem to me to be at all alike. All money received into the treasury, in contemplation of law, remains there until paid out in the manner authorized by the statute. The Auditor's books show that a certain amount of money is in the treasury, and if by any means a portion, or all of it has disappeared without being drawn out on proper warrants issued by the Auditor, the missing money may be replaced without making the report required by section 6, of the act of 1859. At least this could be done during the term of the officer under whose administration the money may have disappeared. After the expiration of his term of office, his successor may demand the money shown by the books of the Auditor's, and Treasurer's offices to be in his hands, and he may pay it over without thereby admitting that he has been guilty of either of the offenses specified in the first section of the act of February 22, 1861. That section provides that any *failure*, or *refusal* of such officer to pay over, or produce any such money, funds, securities, or other property when demanded by any officer, or person entitled to receive the same, or when required by law, shall be held

*prima facie* evidence of the felony therein defined.   The necessary sequence of this provision is, that the payment on demand, or when required by law, is not to be considered as *prima facie* evidence, nor as any evidence, that the party so paying has violated the penal clauses of that section.

It will be seen by reference to the several sections of these statutes, that money that has once come to the Treasurer's hands, and been charged to him on the Auditor's books, may if it has been removed from the proper place of custody, be replaced, or paid over to the Treasurer's official successor without the interposition of the Auditor.

But if there should be a defalcation so long continued as to make it necessary for money paid in discharge of it to be reported to the Auditor, it does not follow that the delinquent officer in making such payment need charge himself with having become liable to a criminal prosecution.   Money may disappear from the treasury, and yet the Treasurer be guilty of no crime, although liable to an action for its recovery. If by reason of the depredations of thieves, burglars, or embezzlement by an employe in his office, the Treasurer should be unable to produce, or pay over on demand, money that had come into the treasury, such failure would not make him a criminal, therefore he could subsequently pay it back by the process prescribed in the act of 1859, without accusing himself of crime.   The statutes provide other methods of ascertaining the state of the treasury.   They are by means of an examination to be made under the authority of the General Assembly, or either branch thereof, or by an account-ant appointed by the Governor, assisted by the Secretary of State—Section 13, of the treasury act, 1 G. & H., 649 ; or by the failure of the Treasurer to pay over to his successor in office the amount shown by the Auditor's books to be chargeable to him—Section 6, of the embezzlement act, 2. G. & H., 457.   If in either case a deficiency is found to exist, I think the Treasurer may make the loss good, even

through the medium of a report to, and draft upon him by the Auditor of State, because he need not, in making good the loss, charge himself with having criminally abstracted the funds. It would be enough for him to say in his descriptive report to the Auditor that the money was due on account of a deficiency in the treasury, stating the particular fund, or funds in which the deficiency existed. He need not state that it had been feloniously withdrawn by him, while in the case we are now considering, the very fact of reporting to the Auditor that certain interest is due from him on loans, or deposits made from the treasury, makes him a self-accuser, and at the same time furnishes evidence ample to convict him of the felony defined by the first section of the embezzlement act.

For the foregoing reasons, if there were no others, I should feel constrained to hold that the State can not maintain a civil suit against an ex-Treasurer of State for interest charged to have been realized by him from loans of State funds, so long as she makes the requirement that he shall not pay such interest into the treasury in any other way than by accusing himself of the commission of an offense against the criminal code, and placing on record evidence to be used against him in case the State should resort to a prosecution for such offense.

State of Indiana *v.* Kimball.

*Held:* That the Legislature may by joint resolution, a recognized form of expressing the Legislative will, give the Attorney General authority to act as the attorney, or person who informs, or relates to the Court the grievances of the State, and asks the Court to redress these wrongs, which it is alleged the State has sustained, and under such authority he may institute this suit. *Per Rand, J.*

*Held:* That there is no penal, or criminal punishment provided in the Treasury Act of 1859, for its violation; that the act of 1861 so far amended that act as to punish officers for violating that part prohibiting the *loaning, using, or depositing in bank, or with other persons*, the public funds; that such act of 1861, instead of repealing a part, and substituting others, was intended only to place around the treasury additional safeguards to prevent the use of public funds by officials. *Per Rand, J.*

*Held:* That the interest made by the Treasurer on the funds belonging to the treasury is the property of the State, and the failure of the Treasurer to account for and pay the same into the treasury, for the reason that his so doing would furnish evidence against him which might be used in a criminal prosecution, or for *any other reason*, does not affect the State's right to the same, and the failure to pay the same is a breach of the conditions of his bond. *Per Rand, J.*

*Held:* That no demand for such interest is necessary before suit—coming his hands *as Treasurer*, he is required to fully account for the same under Sec. 5, Act 1859, and failing so to do, is another breach of the bond. *Per Rand, J.*

RAND, J.—This was a suit brought in the name of the State of Indiana on the relation of Bayless W. Hanna, Attorney General, against Nathan Kimball, as principal, and the other defendants as sureties on the official bond of said Kimball as Treasurer of State.

The bond in suit is conditioned according to the requirements of the statute that Kimball "shall honestly and faithfully discharge the duties of his office, and that all persons by him intrusted with any of the concerns thereof shall act with fidelity, and that he shall render just and true accounts of the condition of the treasury of said State when required by law, and shall at the end of his term, or sooner, or at the expiration of his office, pay, and deliver to his successor, or to such person as may be otherwise authorized to receive

them, all moneys, securities, assets, and property of every kind belonging to the treasury of said State in his hands as such Treasurer, or in the hands of any of his employees."

The only breach which we have to consider, is the allegation that he did not honestly, and faithfully discharge his duties as Treasurer of State, nor did he pay, account for, and deliver to the plaintiff, or his successor in office, or other person authorized to receive the same, all the moneys, securities, and assets belonging to the plaintiff, but that during his term of office he, as such Treasurer of State, received, and had under his control a large amount of money belonging to the plaintiff, which he used on his own account, and in his private business, loaned to divers persons at interest, and deposited in banks of deposit at interest, and by reason of such use, loans, and deposits he made, and received interest, profits, and income thereon to a large amount, and which he has failed to account for, or pay over to his successor, but has converted the same to his own use.

The Court at Special Term sustained a demurrer to the complaint, and on appeal two questions are raised by the assignment of errors:

*First*, Whether the State, on the relation of the Attorney General, can maintain the suit?

*Second*, If it can be maintained on such relation, does the complaint state facts sufficient to constitute a breach of the conditions of the bond?

The first point was so fully, and ably discussed by Judge Blair at Special Term, that I will content myself by referring to his argument, and the authorities there cited, and say that I concur with him that the suit can be maintained on the relation of the Attorney General.

He says: " It is contended that the action is not brought by any person as relator that has a right to institute the said action, or prosecute the same as such relator, the Attorney General not being authorized to institute said action as

relator, or otherwise, and the State Auditor being the only person authorized by law to institute the same."

In support of this, it is insisted that the sixth and seventh clauses of section two, of the act defining the powers, and duties of Auditor of State, being express statutory enactments, preclude the Legislature from conferring upon the Attorney General, by a joint resolution, the authority to institute the suit. The statute referred to reads as follows:

"Section 2. He shall,    *    *    *    *Sixth,* Institute, and prosecute, in the name of the State, all proper suits for the recovery of any debts, moneys, or property of the State, or for the ascertainment of any right, or liability concerning the same. *Seventh,* Direct, and superintend the collection of all moneys due the State, and employ counsel to prosecute suits instituted at his instance on behalf of the State." 1 G. & H., p. 118.

It is undoubtedly true that a joint resolution is not a law; but how far the Legislature may control, or direct the action of officers by a joint resolution, has never been fully, and authentically determined.

As a joint resolution is not a law, it follows that a law can not be changed, or amended thereby, and hence where the powers, and duties of an officer, and the manner of executing the same, are prescribed by law, no change of these duties and powers, and their mode of exercise, inconsistent with the statute, can be made by a joint resolution.

The case of *The State ex rel Brown* v. *Bailey*, 16 Ind., 46, has been cited and commented upon by counsel, and a brief review of the case will aid us somewhat in the present examination. In that case the duties, and authority of the Secretary of State, with reference to the distribution of the laws, were prescribed by express statute, and these enactments required him to distribute the laws in one volume to the several counties of the State. The Constitution also provides that " No act shall take effect until the same shall

have been published and circulated in the several counties of the State, by authority, except in case of emergency, which emergency shall be declared in the preamble, or in the body of the law." Const., Art. 4, Sec. 28.

We see from the foregoing, that the law was in perfect harmony with the Constitution, and conferred the necessary "authority" upon the Secretary of State to publish, and circulate the laws in one volume.

On the 9th of June, 1852, while the foregoing law was in force, the Legislature, by a joint resolution, directed the Secretary of State to publish, of the many laws passed at that session, a certain railroad act, and four others, and circulate them as soon as convenient. They were so published, and circulated, and the court held that they took effect, and were in force long before the laws were published, and circulated, according to the provisions of the law then in force.

The Constitution required the laws to be published, and circulated " by authority." There was a law in the statutes conferring that authority, and prescribing the manner of its exercise.

The Legislature, by a joint resolution, conferred the same authority, and prescribed a mode, differing somewhat from the statute, by which it should be exercised, and the acts of the officer under it were held to be valid, and the laws circulated were held to be in force.

This was not changing the law by the joint resolution. The law remained as it was, and required the Secretary of State to comply with its provisions, by afterwards circulating all the laws in one volume. Suppose the joint resolution had conferred the authority upon the Auditor of State, or some other officer, would the ruling have been otherwise? I fail to see any reason for supposing that it would have been different.

In the case cited, the Constitution required the laws to be circulated by authority. A statute conferred that authority,

The Court held that the Legislature by a joint resolution, differing in some immaterial matters from the statute, had also conferred the authority.    This, I take it, is the force, and effect of the decision in the case cited.

The repealing of laws by implication is not favored, and if two statutes are not absolutely inconsistent with each other, and a construction can be given that will uphold each, a court will not hesitate to give such construction.    Hence if other statutes were enacted giving some other officer the same power to institute suits, which is conferred upon the Auditor of State by the statute before cited, the two enactments would not necessarily conflict with each other.

It has been held by the Supreme Court in the case of *Shook et al* v. *The State ex rel Stevens*, 6 Ind., 113, that any officer "entrusted with the duty of protecting, and preserving the surplus revenue fund may be a relator in a suit on a bond to secure a loan from that fund; and we may have many instances where the same powers can be exercised by different officers.    The officer first instituting a suit would have precedence, and any second suit by any other officer for the same cause of action would be abated by the prior suit, and but little if any trouble would ensue from the apparent conflict of authority.    The question then arises—if one officer is authorized to institute suit by law, may another have the same authority given him by joint resolution.    The office of Attorney General was created by law in 1855, and the fourth section of the act is as follows:

" Such Attorney General shall prosecute, and defend all suits that may be instituted by, or against the State of Indiana, the prosecuting, or defending of which is not already provided for by law, whenever notified ten days of the pendency thereof by the Clerk of the Court in which such suits are pending, and whenever required by the Govenor, or a majority of the officers of State in writing, to be

furnished him within a reasonable time for the purposes therein contemplated." 1 G. & H., page 118.

Various officers are required by the law to execute official bonds payable to the State of Indiana. These bonds, in case of officers entrusted with moneys, are conditioned for the faithful discharge of their duties, and paying over, and accounting to the proper persons for all money that may come into their hands, etc. For a breach of the condition of these bonds, suit will be in favor of the party injured. If it is an individual that is injured by the loss of, or failure to account for his money, he must be the relator, and the suit must be in the name of the State, on his relation. 2 G. & H., p. 41, sec. 7.

If the public revenues of the State, or any of the public funds are lost, or not accounted for, the whole people of the State are interested; they are injured, and an action lies, and in such case no relator is necessary. The State of Indiana in her sovereign capacity may sue. *Fry* v. *The State ex rel Auditor of State*, 27 Ind., 348; *Same* v. *Francis*, 30 Ind., 92. Who, then, may put the machinery of our State in motion? Delay may render the remedy of no avail. What authority is necessary to be given by the State to an attorney, or attorneys to draw up a complaint, or commence the action, and prosecute it to a final determination? How shall the State act? The powers of the State government are vested in three departments—the Legislative, the Executive, including the Administrative, and the Judicial. Legislative enactments have given the State of Indiana a right of action. Courts have been organized by law, constituting the Judicial Department of the State government, and the Courts are open to try that right of action.

The Legislature has by a law given the Auditor of State a right to commence the action.

The same Legislature has also said, by a joint resolution, a recognized form of expressing the Legislative will, " that

the Attorney General of the State, with the advice and con-
sent of the Governor, be, and he is hereby directed, and
authorized to examine into, and collect, by suit, or otherwise,
all claims, debts, and choses in action now due, and owing
to the State of Indiana," etc.   Acts of 1871, p. 70.

The right which is by law vested in the Auditor of State
to bring the action, is not a right coupled with an interest,
so as to give him a vested right to the exclusion of any
power to vest the same right in another.   The joint resolu-
tion simply gives the Attorney General authority to act as
the attorney or person who informs, or relates to the Court
the grievances of the State, and asks the Court to redress
these wrongs which, it is alleged, the State has sustained.

The case of ——— is in many respects similar to the one
before the Court, and will be found to support the views here
taken.

The joint resolution changes no law, suspends, or repeals
no law, does not profess to create any new cause of action,
or new device in the enforcement of a remedy ; and taken in
connection with the sections heretofore cited from the act
creating the office of Attorney General, I believe it confers
on him the necessary authority to institute the suits.

The second point made, that the breach assigned does not
state facts sufficient to constitute a breach of the condition
of the bond, is attended with more difficulty.

From the statement heretofore made, it will be seen that
the State seeks to recover of the defendants interest, profits,
and income received by the defendant Kimball from the use
of money of the plaintiff in his private business. and from
loans, and deposits of the money of the State, and which he
failed to account for, and pay over.   It is not charged that
there has been any failure on his part to account for, and pay
over any portion of the principal of moneys that come to
his hands as Treasurer of State.

An examination of the statutes relating to the duties, and

obligations of the Treasurer of State is necessary in the consideration of the question presented by this demurrer. In 1859 an act was passed to provide a treasury system for the State of Indiana—1 G. & H., p. 645. Without citing the act in full, it will be necessary to notice the following provisions contained therein :

Section one provides that the room occupied by the Treasurer of State, together with the safes, vaults, etc., " shall constitute the treasury of the State of Indiana," and the Treasurer is required to use the same as the sole place for the deposit, and safe keeping of the moneys of the State," etc.

The third section specifies what moneys shall be paid into the State treasury.

Section four requires the execution of a bond by the Treasurer, and sets out the conditions it shall contain.

Section five prohibits the Treasurer from *loaning*, *using*, or depositing in any bank, or with any person any of the moneys of the State, and says the same shall be safely kept until directed to be paid out, or transferred by law, and the Treasurer is " expressly prohibited from receiving in any manner, for his own use any interest, premium, gratuity, bonus, or benefit whatever, by the disposition of, or arising out of any money, or property belonging to the State, or to any county, or to any fund of the State, or county, or of any loan obtained for the State, or for any county ; *but whatever is so received shall by him be fully accounted for.*

The sixth section requires every person making payments into the treasury to first furnish the Auditor of State with a description of the liability on account of which payment is to be made; this is to be certified to the Treasurer, and the Auditor must also " make his draft in favor of the Treasurer upon the person making the payment, and the certificate, and draft must then be presented to the Treasurer, and he shall receive the money ; and the Treasurer is expressly pro-

hibited from receiving any money into the treasury except it be thus paid upon draft.

Section seven expressly prohibits the Treasurer " from paying any money out of, or transferring any money from the treasury of the State, except upon the warrant of the Auditor of State," etc.

The act of 1859, it will be seen, not only creates a treasury room with safes, and vaults, but requires the Treasurer of State to keep the money belonging to the treasury there, and forbids his *loaning*, *using*, or depositing it in bank, or with any person. If, however, the Treasurer does violate these provisions of the act, it prohibits his profiting from such violation, by further providing that if he does—" *whatever is so received shall by him be fully accounted for.*"

This undoubtedly means that whatever profits he makes shall belong to the State, and be by him paid into the treasury; and there are two reasons why he should be required to do so, to-wit:

*First*, Because the money upon which he has made profit belongs to the State, and the increase ought to follow the principal. This is what may be termed natural equity. The Treasurer is the mere agent of the State, and we know of no case where the agent is entitled to the interest, or gains on the capital of his principal, unless by express stipulations.

*Second*, But the Legislature, by the clause requiring the Treasurer to account for what he received, had a further object in view; and that was the safety of the funds in the Treasurer's hands. If he had to account for all he received, the Legislature undoubtedly thought a strong motive for violating the law would be removed, as the temptation of *personal* gain would be wanting.

There is no penal, or criminal punishment provided in the act for its violation.

The requiring the Treasurer to account for what profits he has received on the money belonging to the State is in no

State of Indiana *v.* Kimball.

sense a penalty, for the plain reason that what he so received was not his—either in equity, or by the terms of the statute.

As the object of the treasury act was to provide for the safe keeping, and disbursing the public moneys, it may reasonably be concluded that the Legislature thought that the provisions of that act would accomplish that end.

But the next Legislature, in 1861, enacted a law to criminally punish officers violating that part of the act of 1859, prohibiting the *loaning, using, or depositing in bank, or with other persons,* the public funds.

The first section says that if any officer intrusted with money of the State, shall use the same by way of investment, or shall loan, or deposit the same, " he shall be deemed guilty of felony, and upon conviction thereof shall be imprisoned in the State prison not less than one, or more than twenty-one years, and be fined not exceeding double the value of the money, etc."

By the third section it is made a misdemeanor for the Treasurer to receive, or pay out any public money in any other manner than is prescribed by law, and on conviction thereof he " shall be fined not less than fifty, nor more than five hundred dollars, and be imprisoned in the county prison not less than one year.

Section five provides that if the Treasurer of State shall receive any fee, bonus, or perquisite of any kind, on account of any public money, and shall fail, or neglect to report, and pay the same into the Treasury, in the manner, and at the time required by law, he shall be deemed guilty of a misdemeanor, " and upon conviction thereof, shall be fined in a sum equal to double the value of the amount so received, and be imprisoned in the county jail not less than one month, nor more than one year."

It is easy to gather from these provisions of these statutes that it was the intention of the Legislature to insure the safe keeping of the money of the State in the hands of her offi-

cers, by surrounding their duties, and obligations with express enactments to prevent the use of public funds for private gain, thereby exposing the funds to loss by improvident speculation.   In placing a construction upon these statutes, we must, if possible, carry out this intention.

I shall now consider whether the two laws can stand together, or does the latter repeal any part of the former by implication, for there is no express repeal.

Counsel have urged with great zeal, and ability that that clause of the fifth section of the act of 1859, which provides that " whatever is so received shall by him be fully accounted for," is by implication repealed by the provisions of the act of 1861, which says " that if any officer intrusted with money of the State shall use the same by way of investment, or shall loan, or deposit the same, he shall be deemed guilty of felony,  and upon conviction shall be imprisoned in the State prison not less than one year, nor more than twenty-one years, and be fined not exceeding double the value of the money."

I conclude the Legislature of 1861 thought the act of 1859 did not throw sufficient safe guards around the treasury, and hence the passage of the act of that year.

Counsel for the State concede the rule to be, that when an act is *penally, or criminally punished,* that a subsequent statute inflicting other, and different punishments for the same offence, repeals the former penalty by implication.

I have already said that there was no penal punishment in the law of 1859, and if I am correct in this, then the rule above stated has no application to this case.   Neither do we find any inconsistency, or conflict in a law that requires a party receiving funds not his own, to account for the same, and also criminally punishing him for receiving them.   Many provisions of our criminal law not only punish criminally the felonious *appropriator* of another's goods, but in law he is also bound to restore the goods taken, with any increase

thereof in his hands, or damages for the detention thereof. The repeal of statutes by implication is not favored by the courts, and they will so hold only in cases where the conflict is such that the one, or the other must give way, or the intention of the law making power is apparent that such repeal was intended. *Spencer* v. *State*, 5 Ind., 41; *Blain* v. *Bailey*, 2, Ind., 165; *Dwarris on Statutes*, 154; *Brown* v. *Lewis*, 5 Hill, 221; *State ex rel Attorney General* v. *Mc Carty*, at present term of this Court.

I regard the act of 1861 as attempting to throw additional safeguards around the treasury, instead of attempting to repeal a part and substituting others. As I have already indicated,. I see no reason why the provisions of each act may not remain in full force. Indeed, the fifth section of the act of 1861 expressly requires the Treasurer, if he has received any fee, bonus, gratuity, or. perquisites of any kind, to pay the same into the treasury of State, and on failure to do so, inflicts both fine and imprisonment.

But it is further urged that inasmuch as the room occupied by the Treasurer, with its safes, and vaults, is made the treasury of the State, and the *sole place* for keeping moneys belonging to the State, and inasmuch also as the Treasurer can only receive moneys into the treasury as prescribed in the sixth section of the act of 1859, that if the Treasurer should pay into the treasury any interest, or gains he may have made on use, or loan of the public funds, he would by so doing furnish evidence against himself for a criminal prosecution, and no man is bound to criminate himself.

I concede that no man is bound to, or can he be required to criminate himself.

This is not a suit for a mandate to compel Kimball to furnish a statement to the Auditor of the amount of interest, or profit he has received on the State's funds, and then to pay it into the treasury. It is now a question whether the State can obtain a judgment against him for the amount he

he has so received, and failed to pay in.   It is said that the suit can not be maintained because he could not account for it, and pay it into the treasury without furnishing evidence which could be used against him in a criminal prosecution, and it would be unjust to require him to answer in a suit when he could not voluntarily pay, and relieve himself.   If there is any hardship in this position, Kimball has voluntarily placed himself in it.   I may here remark that every violator of the statute against larceny places himself in the same condition.   The property he thus takes belongs to the owner, and it is the legal duty of the party to restore it, but we know of no law that would compel him voluntarily to do so. Nevertheless it will hardly be contended that the true owner could not maintain a suit for its recovery.   .

The record in this case, if a judgment should be rendered against the defendants, could not be used against Kimball in a criminal prosecution.

The same argument would prevent the Treasurer from restoring to the treasury the principal he may have improperly taken from the vaults of the treasury, and had not restored before his successor had taken possession of the office.   He could not return it by any mode known to the law, without furnishing evidence against himself in a criminal prosecution.

If I am right that the last clause of section five, of the act of 1859, *which requires the Treasurer to account for all the interest, or gains he may make on funds of the State belonging to the treasury*, is not repealed, then it follows that such interest, or gains belongs to the State, and it does not follow, because a *voluntary* payment of the same into the treasury would furnish evidence which might be used against Kimball in a criminal prosecution, that the title of the State, to the interest, or gains made on its own money is forfeited and the right transferred to Kimball.

I am, therefore, of opinion that the last clause of the fifth

section, of the act of 1859, is not repealed, but is in full force; that the interest that the Treasurer has made on the funds belonging to the treasury is the property of the State, and the failure of the Treasurer to account for, and pay the same into the treasury for the reason that his so doing would furnish evidence against him which might be used in a criminal prosecution, or *for any other reason,* does not affect the State's right to the same, and the failure to pay the same is a breach of the conditions of his bond.

It is said a demand was necessary before a suit was instituted. If I am right that the interest, or gains sued for is the State's, it should have been placed in the treasury by Kimball. If he could not comply with a demand to account without furnishing evidence against himself in a criminal prosecution, then it would be an idle ceremony to make it.

If he had failed to restore the principal which he had illegally taken from the treasury, would it be contended that a demand was necessary? The condition of his bond is: *that he will faithfully discharge the duties of his office,* and also will, at the end of his term, or expiration of his office, pay, and deliver to his successor all moneys, securities, assets, and property of any kind belonging to the treasury of State, in his hands as Treasurer of State, or in the hands of any of his employees.

I have shown that if the Treasurer loans, or deposits the funds belonging to the treasury of State, he has not faithfully discharged the duties of his office; and I have further endeavored to show that if he does loan, or deposit such funds, and receive interest therefor, it belongs to the State, and he is bound to pay the same into the treasury, and if he fails to do so he has not faithfully discharged the duties of his office in this respect. If any interest came to his hands on account of the loan, or deposit of the funds belonging to the treasury of the State, such interest must necessarily come to his hands as Treasurer, because he is required to *fully*

*account for the same*, and if he failed to pay the same over to his successor, it is a further breach of the conditions of his bond.    It was his duty to have left it in the treasury, and turned it over to his successor.

In such case no demand is necessary.    A suit is a sufficient demand.

For these reasons I have been constrained to differ with my brethren in the conclusion which they have come to, and think the demurrer at Special Term should have been overruled.

---

NOTE.—The form of "joint resolution" is generally adopted when administrative, local, or temporary laws are to be passed.   1 *House J.*, 1, 20, 816; 1, 32, 679.

This form of Legislation is recognized in most of our constitutions, in which, and in the rules, and orders of our legislative bodies, it is put upon the same footing, and made subject to the same regulations, with bills properly so called.   *See Art.* 4, *Sec.* 18, *Cons. Indiana.*

In Congress, a joint resolution is governed by the same rules as a bill. *See Wilson's Digest Parliamentary Law, Secs.* 1138, 1139, 1140, *and notes.*— [REPORTER.