# IN GENERAL TERM, 1872.

THE STATE OF INDIANA EX REL THE ATTORNEY GENERAL
*v.* THOMAS B. McCARTY *et al.*

Appeal from BLAIR, Judge.

AUDITOR OF STATE—*duties of as custodian of the Sinking
Fund*—

BOND OF—*liability of sureties on*—

SINKING FUND—*statutes construed*—

EMBEZZELMENT ACT—*construed*—

REPEAL BY IMPLICATION—*discussed*—

PUBLIC OFFICER—*presumption in favor of.*

The Commissioners of the Sinking Fund were empowered by section eight
    of an act of the General Assembly, approved March 8, 1861, to tempo-
    rarily deposit the income of the fund while accumulating for distribu-
    tion, or the purchase of certain bonds therein named, *or for other pur-
    poses of law,* in responsible banking institutions, payable on demand,
    with interest for the benefit of the fund; and the act provided that all
    interest on such deposits should be carried into the fund, and become a
    part thereof.

Said section was not repealed by the subsequent legislation of 1865, and
    1867, whereby the custody of the fund was tranferred to the Auditor of
    State, and the permanent character of the investment thereof was
    changed.

The Auditor of State succeeded to all the rights conferred, and to the liabili-
    ties imposed upon the Sinking Fund Commissioners by the act of 1861.

Therefore, it was the duty of the Auditor of State, in case he loaned any
    portion of the fund, to do so in conformity with the statute of 1861;
    and if he loaned it otherwise, he and his sureties are liable in a suit on
    his official bond, for all interest received by him on such loans.

The same liability exists for interest that might have been received by the
    fund if it had been deposited in conformity with the act of 1861, where
    the Auditor has used the money of the fund in an *unauthorized* manner,

State of Indiana *v.* McCarty *et al*

The word "income," as used in the eighth section of the act of 1861, included both principal, and interest of the money of the Sinking Fund that came into the hands of the commissioners, and authorized the temporary deposit of both principal and interest.

The Auditor of State will be presumed to have done his duty as such officer, until the contrary is shown.

By the embezzlement act of 1861, the officers therein named are prohibited from using public funds in their hands, as their own, or in any manner not authorized by law; such moneys, therefore, could not become the property of the officer holding them, but remained the moneys of the particular fund on account of which they were paid to such officer.

The word "may," in a statute conferring authority upon a public officer, will be construed to mean "shall," when the public, or third persons have a claim, *de jure,* that the power shall be exercised.

*Hanna, Claypool, and Taylor,* for State, appellant.

*W. M. McCarty, Gordon, Browne & Lamb,* for appellee.

Newcomb, J.—The complaint alleges that the defendant McCarty, from March 11, 1867, to the — day of January, 1869, was Auditor of State of the State of Indiana, and that on said first named day the defendants executed their bond to the State in the penal sum of $100,000, conditioned that said McCarty would faithfully discharge the duties imposed upon, and required of him, in accordance with the provisions of the acts of the General Assembly of December 21, 1865, and March 11, 1867, and that he, said McCarty, would safely keep, and account for any moneys that should come into his hands under either of said acts, and faithfully perform his duties in the management of the Sinking Fund.

The breaches assigned are:

*First.* That McCarty received, and had under his control at divers times, and during his continuance in office large sums of money (set out in the complaint) belonging to the Sinking Fund; that he used the same in his own business, and loaned the same to bankers, and brokers, and other persons at large interest, and made, and received profits, interest, and income by the use, loan and deposit of the same, to

the amount of $100,000, which he failed to account for, and pay over to his successor, but converted the same to his own use.

*Second.* That he received said sums of money belonging to the Sinking Fund, and by the statute aforesaid it was his duty to deposit the same at the highest rates of interest that could be obtained therefor, and keep the same distinct from other funds, and that he could during all said time have deposited the same with solvent banks at seven per cent. interest per annum; that he refused to so deposit the same, but mixed said funds with his own individual money, and loaned, and deposited them in his own name, and received profits, interest, and income therefrom to the amount of $100,000, which he failed to pay over, etc., but has converted the same to his own use.

*Third.* The third breach is substantially the same as the second, averring that it was the duty of the defendant McCarty to loan the sum to solvent banks, etc., and collect interest, and add the sum to the principal, and that he could have so loaned it at seven per cent. interest, but that he loaned and deposited it in his own name, and account, and received interest, and converted the same to his own use.

*Fourth.* That McCarty received the money as before alleged; that he, and the other defendants, his sureties, formed, and entered into a conspiracy and confederation to take, and use said fund, and loan the same in their own names for their use, etc., and that in pursuance thereof they did loan the same, and received interest, profits, and income therefor amounting to $100,000, which sum, in pursuance of said conspiracy, with the assent, and permission of McCarty, they converted to their own joint, and several use, etc.

Demurrers to the complaint, and to each breach assigned, were sustained at Special Term, on the ground of a want of sufficient facts to sustain the action, and final judgment was rendered on the demurrer in favor of the defendants, from which judgment the State appeals.

To arrive at a proper understanding of the questions involved, a brief review of the history of the Sinking Fund, and the statutes governing its accumulation and disposition becomes necessary.    On the 28th of Janury, 1834, an act of the General Assembly, entitled " An Act establishing a State Bank," took effect.    This act provided for the creation of a bank in which the State was to own one-half, and individuals the other half of the capital stock.    To enable the State to pay for her stock, and to assist citizen stockholders in paying the second and third installments of theirs, it was provided by section 103 that the State should negotiate a loan of $1,300,000 in specie, at a rate of interest not exceeding five per cent., redeemable after twenty years, and within thirty years, at the pleasure of the State, for which bonds were to be issued by the State.    The amount of the State stock in the bank was fixed at $800,000, and the residue of the five per cent. loan was re-loaned to private stockholders, and other parties on real estate mortgages, drawing annual interest, and the accruing interest was invested in the same way until March 1, 1859, when further mortgage loans ceased by virtue of the statute of that date providing for the distribution of the fund among the several counties.    The manner of creating a sinking fund to repay the State's five per cent. loan, and to accumulate an educational fund was prescribed by sections 113, and 114 of the act of 1834. Those sections read as follows:

SECTION 113.    There shall be created a fund to be called the sinking fund, which shall consist of all unapplied balances of the loan for its stock in the State Bank, or for the purpose of being loaned to stockholders to enable them to meet their stoc' installments in the bank, the semi-annual payments of interest on the State loans to stockholders, and the sums that shall be received in payment of said loans; the dividends that shall be declared, and paid by the State Bank on the State stock, and the dividends accruing on such

State of Indiana v. McCarty *et al*

portions of the stock belonging to the other stockholders as shall have been paid for by the loan on the part of the State, and which shall not have been repaid by such stockholders.

Sec. 114. The principal and interest of said sinking fund shall be reserved and set apart for the purpose of *liquidating and paying off the loan, or loans,* and the *interest thereon* that shall be negotiated on the part of the State for the payment of its stocks in the State Bank, and the second, and third installments on the shares of other stockholders in said bank, *and shall not be expended for any other purpose,* until said loan, or loans, and the interest thereon, and incidental expenses shall have been fully paid, and after the payment of said loan, or loans, and the interest, and expenses, the residue of said fund shall be a permanent fund, and appropriated to the cause of common school education, in such manner as the General Assembly shall hereafter direct."

It is proper to remark here, that in addition to the sums set apart for the sinking fund, a part of the surplus revenue of the United States, which was assigned to this State by virtue of the act of Congress of June 23, 1836, was, under the provisions of an act of the General Assembly, approved February 6, 1837, used by the State to increase her stock in the State Bank, and on the expiration of the bank charter, and the division of the assets of the bank among its stockholders, that portion of the surplus revenue became a part of the sinking fund.

It is not important to cite the subsequent legislation of the State touching the Sinking Fund, previous to the adoption of the Constitution of 1851.

Article VIII, section 2 of that instrument defines what shall constitute the common school fund, and among other items designates:

" The surplus revenue fund."  " The bank tax fund, and the fund arising from the 114th section of the charter of the State Bank of Indiana."

6

Sections 3, 4 and 7 of said Article make further provisions concerning the safety, perpetuity and income of the school fund, namely:

" SEC. 3. The principal of the Common School Fund shall remain a perpetual fund, which may be increased but shall never be diminished; and *the income thereof shall be inviolably appropriated to the support of common schools, and to no other purpose whatever.*"

" SEC. 4. The General Assembly shall invest, in some safe and profitable manner, all such portions of the school fund as have not heretofore been entrusted to the several counties; and shall make provision by law for the distribution among the several counties of the interest thereof.

SEC. 7. All trust funds held by the State shall remain inviolate, and be faithfully and exclusively applied to the purposes for which the trust was created."

No provision was made by law for applying any of the income of the Sinking Fund to the use of common schools, until the passage of the act of March 1, 1859. 1 G. & H., Stat. 574. This act directed the Sinking Fund Commissioners to distribute the fund among the several counties in proportion to the number of children in each county listed for the purpose of common school education, and when it should be so distributed it was required to be loaned by the respective county auditors and treasurers upon real estate security, as other school funds were loaned, and it was provided that the interest accruing from such loans should be used for the purpose of school education.

The 8th section required the Commissioners to keep back in their hands a sufficient amount of mortgages and funds to redeem the bank bonds (the bonds issued under the act of 1834), which should not be distributed, but should be held as security for the payment of said bonds.

SEC. 5 empowered the Commissioners to purchase the bank bonds, when they could do so on reasonable terms.

We quote the 6th section entire :

"SEC. 6.    After the year 1866, when the last of said bank bonds become due and payable according to the condition thereof, the said Commissioners shall immediately thereafter pay off and discharge the residue of said bank bonds, if any there be left, and as soon thereafter as possible collect all debts and convert all the property of said sinking fund into money, and distribute the same as fast as the same may come in, as required by the provisions of this act."

By the terms of the act approved February 22, 1861, commonly known as the embezzlement act, 2 G. & H., 456, it was made a felony for any officer or other person charged, or in any manner entrusted with any money, funds, securities or other property belonging to this State, or belonging to any fund under control of this State, or under control of any State officer, to convert to his own use, or to the use of any other person or persons, corporation or corporations, in any manner whatever contrary to law; or to use by way of investment in any kind of property, or to loan, with or without interest, or to deposit with any person or persons, corporation or corporations, contrary to law; or to exchange for other funds, except as allowed by law, any portion of such money, funds, securities or other property.    This statute clearly embraced the Sinking Fund Commissioners and the fund under their control, as well as the Treasurer and other State officers having public and trust money confided to their charge, and unless excepted from its prohibitions and penalties, the Commissioners would be compelled to let the money realized from the payment of principal and interest from the outstanding mortgages belonging to the Sinking Fund, and also the income of other securities embraced in said fund, to remain idle and unproductive, until such time as enough should accumulate to justify a distribution among the several counties of the State, except so far as the same could be used up in the purchase of bank bonds.    It was

probably to meet this difficulty that the 8th section of the act of March 8, 1861, [3d Statutes, Davis' Supplement, 483,] was prepared. That section reads as follows:

" Section 8. The Commissioners shall be authorized to exchange, or convert the Indiana five per cent. stocks belonging to the fund into bank bonds, as the same can be procured, or purchased, on the best terms practicable, and while the income of the fund is, accumulating for distribution, or for purchasing bank bonds, *or other purposes of law,* they shall have power to deposit the same in responsible banking institutions, with satisfactory security to the amount thereof at any time, at interest, for the benefit of the fund, but payable on demand. All interest that shall accrue on any deposit of sinking fund shall be carried to the fund, and become a part thereof."

The next legislation bearing on the questions arising in this suit was the act of December 20, 1865, 3 Davis Statutes, 490. This statute, it is insisted by the defendants, repealed the 8th section of the act of March, 8, 1861, and from that postulate it is argued that there was no law in force during McCarty's term of office, authorizing him to make temporary deposits; and that being the case, the State can not call upon him, and his sureties to refund any interest he may have realized from the loan, deposit, or use of the sinking fund in its hands, contrary to, or without authority of law.

That act directed the Commissioners of the Sinking Fund to invest the money then on hand, and what might be thereafter paid in of said fund, in Indiana State bonds, or stocks, if the same could be purchased at satisfactory rates, otherwise in United States seven-thirty bonds, the latter to be re-invested in the Indiana securities above named, whenever the same could be purchased at fair rates.

Provision was made for the surrender of the State bonds, or stocks, which might be so purchased, and for the execution, and delivery to the Sinking Fund Commissioners of

the non-negotiable bonds of the State for the same amount bearing six per cent. interest, said interest to be distributed among the several counties at the same time, and in the same manner as other school funds were distributed.

On December 21, 1865, only one day after the taking effect of the statute giving the Commissioners a discretion to invest the money of the Sinking Fund in State, or United States securities, another act was approved, and went into force, known as the State Debt Sinking Fund Act; 3 Davis Stat., 499. This made the Sinking Fund proper a part of the State Debt Sinking Fund, and directed the money then on hand, and to accrue, to be invested in the two and one-half, and five per cent. stocks of the State, the same representing what was termed the foreign, or internal improvement debt of the State.

The seventh section of this statute provided for the abolishment of the Board of Commissioners of the Sinking Fund, and the transfer of their duties to the Auditor of State, as follows:

SECTION 7. The Board of Sinking Fund Commissioners, and all the offices connected therewith, are hereby abolished from, and after the 20th day of January, 1867, and all the property of whatever kind, both real, and personal, belonging to said fund, is hereby directed to be sold on such terms, in such manner, and at such time as said Sinking Fund Commissioners, during their continuance in office, and thereafter as the Governor, Auditor, Secretary, and Treasurer of State shall deem for the best interest of said fund, and the moneys arising therefrom shall be invested in said stocks of the State as in this act provided; and after the 20th day of January, 1867, the Board of Sinking Fund Commissioners shall surrender to the Auditor of State all the books, and papers, stocks, bonds, mortgages, moneys, rights, credits, and effects belonging to said fund, who shall provide a suitable place for their safe-keeping. From, and after the last mentioned date

it shall be the duty of the Governor, Auditor, Secretary, and Treasurer of State to invest all the moneys arising from mortgaged premises, or other sources belonging to said fund, as fast as they are due, and collected, in the said five, and two and one-half per cent. stocks of the State."

The assets of the Sinking Fund having passed to the Auditor of State by virtue of the law of December 21, 1865, the General Assembly passed another act more fully defining his duties, and responsibilities, which was approved March 11, 1867—3 Davis Stat., 487. We copy so much of the first section as has any bearing on this case:

" SECTION 1. That for the purpose of enabling the Auditor of State to discharge the duties, and obligations of his office in relation to the custody, and management of the notes, bonds, and mortgages heretofore held, and managed by the Board of Commissioners of the Sinking Fund, arising directly out of loans made by them, all laws, and parts of laws heretofore adopted, and in force on the 20th day of January, 1867, applicable to the custody, and management of the said loans, and the notes, bonds, and mortgages, are hereby declared to be in force, the provisions of any law to the contrary notwithstanding. And the said Auditor is hereby clothed with all the power, and subjected to all the duties touching the said loans, and the securities therefor, which, by any law in force on the 20th day of January, 1867, were vested in, or imposed upon the said Board of Commissioners of the Sinking Fund, or any officer thereof."

The fifth section required the Auditor to give bond in the sum of $100,000, with sufficient sureties, conditioned for the faithful performance of his duties under this law, and under the law of December 21, 1865, and for the safe keeping, and accounting for any moneys that had, or might thereafter come into his hands, under either of said acts; and, generally, for the faithful performance of all duties growing out of the management of the property, or business of the said Sinking

Fund.　The bond in suit was executed in conformity with this section.

The sixth section provided that whenever the amount of money belonging to the Sinking Fund, in the hands of the Auditor of State, should reach $4,000, or more, he should forthwith notify the Secretary, and Treasurer of State of the amount of said fund in his hands, and the Auditor, Secretary, and Treasurer were thereupon to invest the funds then. in the hands of the Auditor, or under his control, in the five, and two and one-half per cent. stocks of the State, by purchasing the same on the lowest, and best terms they could be had for in the market.

The Auditor was required to keep a list of the stock so purchased, with the price paid therefor, and to report to the Governor at least once in three months, and to the General Assembly at each session, a full account of his transactions, etc.

Having thus noticed all the statutory, and constitutional provisions supposed to bear upon the case under consideration, we proceed to an examination of the questions arising therein, and discussed by counsel, namely:

*First.*　Was the 8th section of the act of March 8, 1861, repealed by the subsequent legislation of 1865–7 ?

*Second.*　If not so repealed, is that section constitutional?

*Third.*　Does Article viii of the Constitution make interest received by the legal custodian of the Sinking Fund, on loans made without authority of law, or contrary to law, a part of that fund, and if so, are McCarty, and his sureties liable therefore in a suit upon his bond ?

*Fourth.*　If the defendants are not liable on the bond, is McCarty liable on common equity principles as a trustee, and can such liability be enforced in this suit?

It has been argued with much earnestness by counsel for the defendants, that the statutes of December 20, and 21, 1865, necessarily repealed section 8, of the act of March 8,

1861, authorizing temporary deposits of the income of the Sinking Fund while accumulating for the purpose of distribution, or the purchase of bank bonds. Undoubtedly the legislation of 1865 did repeal so much of the act of March 1, 1859, as provided for a distribution of the Sinking Fund among the counties, and also that provision authorizing the purchase of bank bonds, but the question remains, did it repeal that part of said 8th section of the act of 1861, which authorized such temporary deposits while the fund might be accumulating " for other purposes of law," or in other words, for other lawful purposes? That section was not expressly repealed by either of the acts of 1865, nor by the act of 1867. If repealed at all, the repeal was by implication, necessarily resulting from an incompatibility between the former, and the latter statutes. But the law does not favor a repeal by implication, and the rule of construction is, that when two statutes are seemingly repugnant, they must, if possible, be so construed that the latter may not operate as a repeal of the former. *Spencer* v. *The State*, 5 Ind., 41; *Blain* v. *Bailey*, 25 Ind., 165; *Bowen* v. *Lease*, 5 Hill, 221; *Wallace* v. *Bassett*, 41 Bard., 92; Dwarris on Statutes, 154–5.

" It has also been held, in pursuance of this maxim," says the Supreme Court, in *Elaine* v. *Bailey*, *supra*, " that an act is not repealed by implication where the Legislature had no intention to repeal it."

We are unable to perceive any legislative intention in the statutes of 1865–7 to make the Sinking Fund unproductive for any period of time, however brief. The purpose was to permanently invest it in a safe and profitable security, as rapidly as the same could be done, but no prohibition appears in either of the acts against temporary deposits of the fund, as authorized by the statute of 1861, while awaiting opportunity to make investments in State stocks.

The uniform current of legislation on this subject shows a purpose to make the fund at all times productive. Its

founders declared this purpose in the 114th section of the bank charter; the Constitution, in the sections cited, proclaims the same purpose, as do also the legislative acts of 1859, and subsequent acts.

Recurring again to the act of 1861, the conclusion seems to us irresistible that the Legislature contemplated the probability of subsequent legislation by which the investment of the undistributed portion of the Sinking Fund might be changed, and that in the event of such change the accumulations might be unproductive for a time, unless authority was given to temporarily deposit them at interest while awaiting opportunities for permanent investment. In view of such possible change of the law, the words, "or other purposes of law" were, in our opinion, introduced into that statute; for while the statute of 1859 remained in force there could be no other "purpose" of accumulation than for distribution among the counties, or the purchase of bank bonds.

While, therefore, there remained a "purpose of law" for the accumulation of the Sinking Fund in the hands of its legal custodian, so long that clause of section 8 of the act of 1861 was operative, and continued in force. It is urged, however, that the statutes of 1865 did not contemplate any accumulation of the fund in the hands of the Commissioners, or Auditor of State, consequently there could be no lawful accumulation, and therefore nothing was left to which the statute of 1861 could attach.

We are not inclined to place such a construction on this statute, especially as the results claimed for it would work injustice to public interests by transferring to the Auditor of State money that properly belongs to the school fund.

In 1865–7, as in 1859–61, that portion of the Sinking Fund available for distribution, or investment in bonds and stocks, consisted of the receipts of interest on mortgage loans, generally small in amount, from payments in full, or

in part, of the principal of mortgage loans, and from interest on State bonds and stocks belonging to the fund. These payments were made at irregular intervals, except interest on State securities; were often in amounts too small to invest in the manner required, and must necessarily be held until a sum accumulated at least equal to the smallest denomination of bonds authorized to be purchased. Furthermore, the Auditor had to find some one who had bonds to sell before he could invest the money in them. True, during the one day the law was in force authorizing the purchase of United States seven-thirties, it might have been possible to instantly invest the money on hand in those securities, but we can not say as a matter of law that it was. And when we consider that while the Auditor was required to invest the funds in State stocks, sums ranging from $61,000 to $259,000 remained in his hands uninvested, and that the complaint does not charge him with failing, or refusing to purchase State stocks when obtainable, we may fairly presume that there was an inevitable accumulation in his hands. Indeed, in the absence of an averment to the contrary, we *must* presume that the Auditor did his duty under the law, so far as it was in his power, and that he could not find employment for all the money that came to his hands in the purchase of State stocks. *Mercer et al* v. *Doe*, 6 Ind., 80; *Evans* v. *Ashby*, 22 Ind., 15; *Culbertson* v. *Milhollin*, Id., 362; 2 Phillips on Evidence, 604.

The purpose of the statutes of 1865, and 1867 was, that the remainder of the Sinking Fund should be invested in the stocks of the State. That purpose was not changed by the circumstance that the Auditor might not be able to purchase stocks as fast as he received money from the assets of the fund, nor could it be changed by his willful failure when opportunity offered to purchase stocks. The lawful purpose, or the " purpose of law," in the words of the statute of 1861, remained, and could be changed only by subsequent legis-

lation. Therefore, while the money of the fund accumulated in the hands of the Auditor, it so accumulated for the purpose declared by law, and while so accumulating he was empowered by the act of March 8, 1861, to temporarily deposit it at interest for the benefit of the fund.

The defendants further insist that section 8 of the act of March 8, 1861, is unconstitutional in this, that it only authorizes a deposit at interest of the *income* of the fund, and that it carries the interest of such *income* to the principal of the fund, and makes it a part thereof, while Sec. 3, Art. viii, of the Constitution, appropriates such income to the support of common schools, and to no other purpose whatever.

The word "income," primarily means the profit arising from an invested fund, or a business, or profession, and the like, and the rule is, that words used in a statute are to be construed in their ordinary, and usual sense, unless it is apparent that the Legislature used them in a different sense. Dwarris, 199, 203.

The acts of 1859, and 1861 are to be construed in *pari materia*, as though they were one act. We must, therefore, look to the act of 1859 to determine the sense in which the word "income" was used in section 8 of the act of 1861. The latter section provides that while the income of the fund is accumulating for distribution, or for purchasing bank bonds, it may be deposited, etc. Those two objects covered the entire fund, principal, and interest. All of it, except enough to redeem, or purchase the outstanding bank bonds, was required by the act of 1859 to be distributed. All money received in discharge of the *principal* of mortgages, as well as for interest, was to be held for distribution, or the purchase of bonds. The word "income," as used in the act of 1861, should receive a definition as broad as the subject matter to which it was applied, that being the entire money receipts from the securities in which the fund was then

employed.   We hold, therefore, that this word in the act of 1859 has the same meaning as the words avails, moneys, or receipts, and must be construed to embrace all receipts of money, whether of principal, or interest, from the mortgages, or other* securities in which the fund had been previously invested.

As to that part of section 8 of the act of 1861, that requires interest received on deposits to be carried into the fund, and become a part thereof, we remark that it is an independent clause, which might be stricken out without invalidating the residue of the section.   Therefore, if unconstitutional, the preceding part of the section may stand. Cooley's Constitutional Limitations, 177-181; *Bank of Hamilton* v. *Dudley*, 2 Peters, 526.

Furthermore, the circumstance that the statute may have directed the interest of the Sinking Fund to be employed in a manner contrary to the Constitution, did not transfer the ownership of such interest to the officer having control of the fund; the Constitution had set it apart for the support of common schools, and prohibited its diversion to any other object; it was the duty, therefore, of the Sinking Fund Commissioners, and afterwards of the Auditor of State, their successor in the trust, to account for such interest, in order that by the proper officers, or by subsequent legislation, if such were needed, it could be applied to its constitutional purpose.   There could be no difficulty in separating the interest from the principal fund, and giving to each its proper direction, and we must presume that the Legislature would perform its constitutional duty by providing for the proper distribution of such interest.

It is further urged by the defendants that inasmuch as McCarty was liable absolutely for the safety of the fund committed to his charge, he had the right to determine how it should be kept, or employed while under his control, and that the money received by him was, while in his official

charge, his money, and all that the State could demand of him was the return of an equal amount on the expiration of his term of office.

In support of this view, we have been referred to the cases of *Halbert et al* v. *The State*, 22 Ind., 125; *Morbeck* v. *The State*, 28 Ind., 86; *Rock et al* v. *Stinger*, 34 Ind.; *Hancock* v. *Hazzard et al*, 12 Cushing, 112; *United States* v. *Prescott*, 3 How., 578, and other authorities.

The point decided in *Halbert* v. *The State*, was that a public officer who is required to give bond for the proper payment of money that may come into his hands as such officer, is not a mere bailee of the money, exonorated by the exercise of ordinary care and diligence, but his liability is fixed by his bond, and the fact that the money was stolen from him without his fault, does not release him from his obligation to make such payment. The other cases cited decide the same principle, and some of them hold that public money received by such officer, in virtue of his office, becomes his money, to the extent at least that the body politic on whose behalf he receives it can not follow it, or securities given therefor by a person to whom the officer has loaned it, or improperly paid it out, but that the remedy must be sought on the officer's bond.

But, in our judgment, these authorities are not applicable to the case under consideration. The embezzlement act of 1861 placed the stamp of individuality on all public or trust funds received by the Auditor of State, and other officers therein named, and expressly prohibited them from using such funds *as their own*, or in any manner not authorized by law; and we think that as to the Sinking Fund the Constitution is to the same effect.

If we are correct in our conclusion that the act of March 8, 1861, authorized the Auditor to deposit in bank the receipts from the Sinking Fund while awaiting opportunity to permanently invest them in State stocks, it follows, as a legal

consequence, that if the fund accumulated to such an extent as to render it necessary or advisable to place the same at interest, it was his duty to do so in the manner authorized by law, and that he could not by loaning, or depositing the fund in an unauthorized manner, relieve himself from his duty to account for interest received.

The permissive word " may " is used in the statute, but the rule of construction is that the word *may* will be construed to be synonymous with *shall*, where public interests and rights are concerned, and where the public, or third persons have a claim *de jure* that the power shall be exercised. *Nave* v. *Nave*, 7 Ind., 122; *Bansemer et al* v. *Mace et al*, 18 Id., 27; *Newburgh Turnpike* v. *Miller*, 5 Johns., ch. 101. The people of the State, by virtue of the Constitution, and of the statute, had a right to claim that the money in the Auditor's hands, if placed at interest temporarily while awaiting investment, should be so placed as to secure to the school fund the interest that might be realized, and if the Auditor did, as charged in the complaint, otherwise use it, and receive interest from such use, when he could have deposited it in bank at interest, to the credit of the fund, he is accountable for interest so received. And we are of opinion further, that the Constitution, Sec. 3, Art. viii, by its own inherent force, makes all interest received from the Sinking Fund a part of the School Fund; that by virtue of that section itself it was made the duty of McCarty to account for all interest he received; that as soon as it came to his hands it became a part of the School Fund, and if he has failed to pay the same to his successor, he and his sureties are liable in this suit on his official bond. If he used the money of the Sinking Fund in his own business, or in speculative operations, the defendants should be held liable on their bond for such interest as would have accrued in case the money had been deposited according to law, but not for the profits of any business in which McCarty may have

employed the funds, for no such liability could have been in the contemplation of the sureties when they signed the bond, nor does it seem to be contemplated in the law under which the bond was executed.

The conclusions we have reached on the propositions above discussed, render it unnecessary that we shall examine the question whether McCarty can be held liable as a trustee merely, for interest, or profits received from the Sinking Fund, and we express no opinion on that subject.

At Special Term the defendants presented by demurrer the question as to the legal capacity of the Attorney General to institute, and prosecute this action. It is averred in the complaint that the suit is brought by the consent of the Governor; but it is insisted by the defense that the action could be brought only by the Auditor of State 1 G. & H., 119, sec. 2, or by the Attorney General when *required* by the Governor, or a majority of the officers of State. 1 G. & H., 118, sec. 4. The demurrer assigning that cause was overruled, the Judge at Special Term holding that the Attorney General, with the advice and consent of the Governor, was authorized by the joint resolution passed at the session of 1871—acts of 1871, p. 70—to commence, and prosecute the action in the name of the State. We concur unanimously in that ruling, and content ourselves with referring to the published opinion of Judge Blair on that part of the case, without a fresh discussion of the question here.

The judgment is reversed for the error at Special Term in sustaining the demurrer of the defendants to the complaint on the ground that it, and the several breaches did not set forth facts sufficient, etc., and the case is remanded for further proceedings in conformity with this opinion.

BLAIR, J.—I have been unable to reach the same conclusions with my brother Judges, or to change in any essential particular the opinion rendered at Special Term, and I have

thought it right to give my views on one or two points involved in the case.

Prior to the 20th day of January, 1867, the Sinking Fund was under the control, and management of five commissioners, elected by the Legislature, known, and designated as the Sinking Fund Commissioners. Their powers, and duties were defined by law. The manner of loaning, and investing the fund for purposes of accumulation, was controlled by express statutory enactments; and it is true that by the eighth section of the act of 1861, 3 Stat., 483, the Commissioners were authorized to convert the Indiana five per cent. stocks belonging to the fund into bank bonds, as the same can be purchased on the best terms practicable; " and while the income of the fund is accumulating for distribution, or for purchasing bank bonds, or other purposes of law, they shall have power to deposit the same in responsible banking institutions, with satisfactory security to the amount thereof, at any time, at interest, for the benefit of the fund, but payable on demand."

The main question in this case depends upon the above provision. If this section is still in force, and applies to the Auditor of State in his management of the fund, there are forcible reasons for holding him liable on his official bond for interest acquired on deposits, and not paid over. The seventh section of the act of December 21, 1865—3 Stat., Davis' Sup., p. 502—abolished the Board of Sinking Fund Commissioners from, and after the 20th day of January, 1867, and at that date, all books, papers, stocks, bonds, mortgages, moneys, rights, credits, and effects belonging to the fund were to be surrendered to the Auditor of State, " who shall provide a suitable place for their safe keeping." By the further provisions of the same section it was made the duty of the Governor, Auditor, and Treasurer of State to invest the moneys belonging to the fund as fast as they should be collected, in the five, and two and one-half per cent. stock of the State.

No bond was by this act required of the Auditor of State, touching his duties relative to the custody and management of the Sinking Fund that was to come into his hands, and it seems to have been conceived by the Legislature that the duties of the Auditor in relation to the fund were not defined, and that the laws applicable to the management of the fund, loans, etc., in the hands of the Board of Sinking Fund Commissioners did not apply to the Auditor of State, and that he might have some difficulty in collecting outstanding loans, and indebtedness to the fund, and to remedy this defect the act of March 11, 1867, was passed, (3 Stat., Davis' Sup., p. 487,) continuing in force " all laws heretofore adopted, and in force on the 20th day of January, 1867, applicable to the custody, and management of the said loans, and the said notes."   No laws governing the Board of Sinking Fund Commissioners were continued in force by express enactment, except those relating to the loans, and notes, and if necessary that there should be an express statute continuing these laws in force after the mortgages, and notes were transferred to the possession, and control of the Auditor of State, was it not equally necessary that the law relating to the management of the moneys should also be continued in force by express provisions of the statute?  It seems to me that the act of 1867 recognizes the true rule of construction, and is an express recognition on the part of the Legislature, that the laws in force on the 20th of January, 1867, and before that time, governing, and defining the powers of the Board of Sinking Fund Commissioners, did not apply to the Auditor of State, and could not be made to apply to him except by express legislative enactment.

It might well be, that the Legislature would be willing to trust a judicious board of five commissioners with power to determine the " *responsibility* " of a banking institution, and the " *security* " given by the bank, when they would be unwilling to vest the same power in the hands of a single

7

officer.   The deposit of the money in a banking corporation is an important matter, requiring the exercise of sound discretion, and judgment to see that the fund is not endangered, and it seems to me a dangerous principle to sanction the transfer of such power from one officer, or class of officers to another officer, except by statutory enactment.  If the act of 1865 had said that the Auditor shall be vested with all the power, authority, etc., then vested by law in the Board of Sinking Fund Commissioners, there could have been no doubt but that this eighth section of the act of 1861 would be held to be in force; but in the absence of any provision of the kind, I believe the Auditor had no authority given him to deposit the money in banking institutions, but that it was his duty, according to the provisions of the act of 1865, to keep the money under his immediate control, and custody, or, in the language of the act, "to provide a suitable place for their safe keeping."   I do not believe that the power was intended to be given him by the Legislature to deposit the funds in banks, thereby releasing him, if the deposit was made in good faith, and in the exercise of reasonable care, from the absolute liability that would otherwise attach to him, as an officer, of keeping the fund secure from loss in any event.   Under the act of March 11, 1867, the bond in suit was required to be given by the Auditor, and it is conditioned as provided in the act.   This bond, is the contract made by the officer and his sureties with the State.   If the Auditor is liable on the bond, his sureties are also liable.   It is unnecessary to cite authorities to show that the liability of sureties can not be extended by implication beyond the terms and condition of their bond.   It is the full measure of their liability.   It does not follow that because the State may have a strong equity on her side, as against the Auditor, or because she may have a right to call upon him in his personal capacity to respond to her demands, that he, and his sureties are liable on his official bond.   The question of

personal liability of the Auditor is not presented by the pleadings in the case, and hence is not proper to be considered here, for the suit is upon the official bond, and there must be an absolute breach of the conditions of the bond to sustain a recovery against the defendants. While no dry, or technical construction can defeat any rights which the plaintiff may have, there must still be a distinct breach of the contract to render the Auditor, and his sureties liable.

The language of the fifth section of the act of March 11, 1867, prescribed the conditions of the bond in suit, and the bond is conditioned as required by the act, " for the faithful performance of his duties under this law," (that is, under the act of 1867), " and under the law passed at the extra session in 1865," (that is, the act of 1865 which abolished the Board of Sinking Fund Commissioners, before cited)   *   *   *   *   *   " and generally for the performance of all duties growing out of the administration, or management of the property, or business of the Sinking Fund." Now, it is a rule of construction, that general words, or terms in a statute refer to, and are controlled by specific terms, hence the latter general clause in the statute, and in the conditions of the bond, I take it, refer to the general duties of the Auditor under the acts specifically referred to. But as I regard the eighth section of the act of 1861 as inoperative, and can not be applied to the Auditor, a rigid application of the above rule is unnecessary for the purpose of the present case.

I have also been unable to find that the liability of the defendants can be in any way increased by reason of the constitutional provisions contained in the third, and fourth sections of Article viii, of the Constitution. Section three prohibits the principal of the fund from being diminished, and says the increase of the fund shall be inviolably appropriated to the support of common schools. Section four makes it the express duty of the Legislature to invest the

fund in some safe and profitable manner. This must, of course, be done in accordance with some law enacted by the Legislature, defining the safe, and profitable manner of investment.

If the Legislature has neglected to pass the necessary laws to keep the money invested as required by the Constitution, but has suffered it to accumulate in large amounts, and lie idle in the hands of the Auditor of State, he, as an officer being liable for its safe keeping in any event, even if it should be stolen from him, I do not see that the Constitution enlarges his liability for interest received on deposits of the fund, when the principal, and all accumulations provided for by law are accounted for at the proper time.